[No. B233521. Second Dist., Div. Three. Dec. 6, 2012.]

THE PEOPLE ex rel. FIRE INSURANCE EXCHANGE et al., Plaintiffs and Respondents, v.
NEIL R. ANAPOL et al., Defendants and Appellants.

810

## COUNSEL

Lawrence & Associates and Amy B. Lawrence for Defendant and Appellant Neil R. Anapol.

Nemecek & Cole, Jonathan B. Cole and Jon D. Robinson for Defendant and Appellant Robert B. Amidon.

Manning & Kass, Ellrod, Ramirez, Trester, Dennis B. Kass and David J. Wilson for Plaintiffs and Respondents.

## OPINION

**CROSKEY, Acting P. J.**—Fire Insurance Exchange and Mid Century Insurance Company (collectively Farmers) uncovered what they believed to be a massive insurance fraud ring engaged in the submission of false and/or inflated claims for smoke and ash damage arising from several Southern California wildfires. It brought the instant qui tam action against several members of the alleged ring, including two attorneys, Neil R. Anapol and Robert B. Amidon, who submitted the purportedly false insurance claims on the part of Farmers's insureds. As against the attorneys, Farmers alleged both the submission of false claims and the use of cappers to obtain insureds willing to pursue such claims.

The attorneys brought motions to strike the complaint under Code of Civil Procedure section 425.16 (anti-SLAPP motions), arguing that their pursuit of insurance claims and acts in obtaining clients constituted prelitigation conduct protected by their First Amendment right to petition. The trial court denied the motions on the basis that the attorneys had failed to establish protected conduct, specifically relying on authority holding that the submission of insurance claims does not constitute protected conduct under the anti-SLAPP law. (*People ex rel. 20th Century Ins. Co. v. Building Permit Consultants, Inc.* (2000) 86 Cal.App.4th 280, 285 [103 Cal.Rptr.2d 71] (*BPC*).)

The attorneys appeal, arguing that *BPC* was wrongly decided, or should be distinguished when the underlying insurance claim was submitted *in expectation of litigation against the insurance company* for the anticipated bad faith

denial of the claim. We agree with the attorneys that, under the proper circumstances, submission of an insurance claim can constitute prelitigation conduct protected by the anti-SLAPP law. However, we conclude that bald assertions that the claims were submitted with the subjective intent that litigation would follow are insufficient, without more, to constitute prima facie evidence that the insurance claims constituted prelitigation conduct. As the attorneys submitted no additional evidence in this case, they failed in their burden to show that the anti-SLAPP statute applied, and their motions were properly denied. We therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. Underlying Facts

There is little agreement between Farmers and the attorneys as to the underlying facts. This much is clear: (1) There were wildfires in Southern California in 2003, 2007, 2008, and 2009; (2) Attorney Anapol represented a number of Farmers's insureds in their pursuit of smoke and ash claims arising out of the 2003 wildfire; (3) Attorney Amidon represented a number of Farmers's insureds in their pursuit of smoke and ash claims arising out of the wildfires in 2007, 2008, and 2009; (4) Glenn Sims, and/or one of the companies with which he was affiliated, was involved to some degree in the claims handling process on behalf of the insureds; (5) Farmers paid on some, but not all, of the claims; when it did pay, it often did not pay the full amount sought by the insureds; and (6) Attorneys Anapol and Amidon represented Farmers's insureds in bad faith actions arising out of Farmers's handling of the smoke and ash claims, some of which are still pending.[1]

According to Farmers,[2] however, there was a conspiracy to defraud Farmers (and other insurance companies), which was the brainchild of Sims.[3] Sims was what is known as a "catastrophe chaser." He travelled the country, following natural disasters. After a disaster, he would advertise in the area for

---

[1] There is some overlap between the group of insureds whose claims are the basis of the fraud alleged in the instant action and the group of insureds who are plaintiffs in the bad faith actions. However, some insureds whose claims are the basis of the fraud alleged in the instant action are *not* bad faith plaintiffs, and some of the bad faith plaintiffs brought claims which are not the basis of the fraud alleged in the instant action.

[2] While we set forth some of the testimonial and documentary evidence in this case, we recognize that objections were interposed to nearly all of the evidence, and the objections have not yet been ruled upon. In reciting Farmers's view of the underlying facts, we do not mean to imply that Farmers can establish the truth of the facts it asserts or that Farmers's evidence is admissible. We simply set forth Farmers's view of the underlying facts in order to give some context to our legal discussion.

[3] Sims is a convicted felon. At the time of this action, criminal proceedings were pending against Sims for 19 counts of fraud arising from reopened Northridge earthquake claims.

clients, letting them know that he could obtain substantial insurance benefits for them for damages about which they may have been unaware.[4] Sims was not a public adjuster, however, and chose to conduct his business through the use of attorneys. Thus, when a homeowner would contact him, Sims would have the client execute a retainer agreement with an attorney with whom Sims worked. Sims would then submit to the insurer a letter from the attorney designating Sims as a "property damage consultant" on the claim, and requesting the insurer to negotiate directly with Sims.[5] Sims would then send someone to "scope" the claim and create a repair estimate, often based only on the size and contents of the home, with no attention paid to whether there was evidence of actual damage.[6] Sims would submit the estimate and

---

[4] The record in this case includes a flyer reading, in part: "GOT ASH? [¶] Or Smoke Residue? [¶] From the fires? From the winds? [¶] The fires are gone and the smoke has cleared. The winds continue to remind us of the catastrophe that occurred here in Southern California. The remains are on your walls, ceilings, carpet, in your pools, on your patios, in your air ducts and so many other places you don't even see. [¶] You will qualify for $$ thousands of dollars for cleaning of your home inside and out! [¶] Because this was a *Federal Catastrophe* this does NOT affect your insurance record or your annual premiums! [¶] Must be properly turned in! SATI[S]FACTION GUARANTEED!! [¶] No out of pocket cost to you!! [¶] Call us for details on how we can help you!"

[5] The record contains one such letter, over Attorney Anapol's signature ("by CK," an associate of Sims), which states, in part, "I have been retained by your insured to handle their fire/smoke damage claim. Enclosed please find the signed Designee Authorization, from your insured, authorizing my Law Office·to act on their behalf. [¶] Please be advised that I will be utilizing the services of Glenn Sims and Associates, Inc. as property damage consultants for the above referenced claim. . . . [¶] Please work with Mr. Sims or Ms. Kinch, of Glenn Sims & Associates, Inc. and meet with them to discuss the damages and reach an agreed scope regarding the real and/or personal property damage relevant to this claim. All appointments pertaining to the scope of the loss or to inspect my client's property may be made through Glenn Sims & Associates. . . . [¶] Please be advised that pursuant to the retainer agreement that your insured signed with my office, I am asserting a lien on any and all monies your company pays in settlement of this claim. Please include my name on any such settlement check or drafts, and send them care of my office."

[6] The record contains a document which is purportedly Sims's instructions to homeowners on calling in claims. It reads, in part, as follows: "**Calling in a claim** [¶] 1. Call in and say I would like to call in a claim because of the wildfires of Oct. 2007. Specific date? Late October 21–22–23–24–25–26– You may know the days better! [¶] 2. The wind blew in the soot and ash for a few days during and after the fires. Every time the wind blows it is still very noticeable. Still smell it at different times. [¶] 3. In the windows, doors and it comes through the a/c vents, must be in the attic. Etc. . . . [¶] **Talking with adjuster** [¶] **Why did you wait so long to turn in a claim**? [¶] You were just now told it was covered by insurance. Your friend or relative (pick one) JUST told you they had there [*sic*] house cleaned and the insurance company paid for it. [¶] 3. [*sic*] What are the damages? The wind blew in soot and ash through the windows, doors and it comes in through the air conditioning vents. Still smell the smokie [*sic*] smell when you run the heat or a/c. You wiped some off of walls and baseboards in some place like by the windows. There was ash everywhere and on everything in the house. Tracked it in on the carpets etc. . . . (that is covered) [¶] **You can elaborate at this point**. [¶] We have spent a lot on cleaning but feel we need professional help to clean it up properly. You have got to sell this to the adjuster if we can't still see much anywhere. The insured is ALWAYS right. You

negotiate a settlement of the claim. Once a settlement was received by the attorney from the insurance company, it was divided, on a percentage basis, between the client, the attorney, and Sims (and his associates).[7] In sum, according to Farmers, the part played by the attorneys in this conspiracy included (1) paying Sims to obtain clients to submit insurance claims and (2) submitting false and/or inflated damage estimates in support of claims.[8]

. The attorneys, not surprisingly, have a different view of the facts. According to the attorneys, all of their clients were legitimate referrals; the attorneys did not pay Sims for obtaining clients. Moreover, according to the attorneys, all of the damage estimates submitted were legitimate. In the alternative, the attorneys take the position that if Sims submitted fraudulent documents in support of the claims, the attorneys had no knowledge of this fact, and believed all of the claims to be legitimate. Finally, the attorneys argue that Farmers improperly denied or undervalued the claims, causing the attorneys to bring bad faith actions.

### 2. *Allegations of the Complaint*

On September 2, 2010, Farmers brought the instant action, both on behalf of itself, and on behalf of the People. It named as defendants Sims, Attorney · Anapol, Attorney Amidon, and several related entities. The complaint alleged

---

have to remember that. Remember, you DID have LOTS of evidence for days during and after. [¶] 4. You have cleaned up the best you can. You have spent hours on weekends and after work (whatever your situation is), cleaning up. But when the wind blows you notice more again and can still see the evidence. When the A/C or hea[t] runs you can still smell it. [¶] 5. Your friend or (whoever) referred a cleaning company (which is an estimate that I will provide) and they came out and will give you an estimate. You DO NOT remember the name of the company at this point. After you get an adjuster and his name we will decide who we are using for the cleaning company. There is a good reason for this." (Original boldface.)

[7] According to Farmers, at one point, Attorney Anapol indicated that he no longer wanted to pay Sims on a percentage basis and changed the arrangement so that Sims would be compensated on the basis of a fixed fee per claim. The record contains a spreadsheet entitled "FIRE-Client Status Sheet**10/10/2004" on which Sims's office apparently kept track of all of the claims. According to the witness who purportedly authenticated the document, the original was color coded; the green claims were paid by percentage and the blue ones were paid by time and cost. The copy in the record on appeal, however, is in black and white.

[8] In support of his anti-SLAPP motion, Attorney Anapol requested the trial court take judicial notice of the prosecution's introductory case brief in Sims's criminal prosecution. The brief sets forth the prosecution's view of Sims's conspiracy. With respect to Attorney Anapol, the prosecution stated, "None of this was hidden from Mr. Anapol. He knew exactly what Mr. Sims was doing and approved it. Mr. Anapol essentially outsourced his law practice to Mr. Sims. He allowed Mr. Sims to solicit and sign up clients by the wagonload and to personally handle all aspects of their claims while he dozed back at the office. Thus, Mr. Sims effectively acted as both damage consultant and de facto attorney, at least until the carrier disputed a claim and it became necessary to wake up Mr. Anapol. Otherwise Mr. Anapol's job was merely to receive and divide the settlement proceeds when claims were paid."

three similar fraudulent schemes, one involving the 2003 wildfire, one involving the 2007 wildfire, and one involving the 2008 and 2009 wildfires.[9] With respect to each scheme, a cause of action for violation of Insurance Code section 1871.7 was alleged.[10] Specifically, defendants were alleged to have violated Insurance Code section 1871.7, subdivision (a), which provides that it is unlawful "to knowingly employ . . . cappers . . . to procure clients . . . to . . . obtain services or benefits under a contract of insurance . . . ." Additionally, defendants were alleged to have violated Insurance Code section 1871.7, subdivision (b), which incorporates violations of Penal Code section 550. Defendants were alleged to have violated Penal Code section 550, subdivision (a)(1), which prohibits the knowing presentation of a false or fraudulent insurance claim, and Penal Code section 550, subdivision (a)(5), which prohibits knowingly making, preparing or subscribing any writing with the intent to present it, or allow it to be presented, in support of a false or fraudulent claim.[11]

### 3. *The Anti-SLAPP Motions*

Both Attorney Anapol and Attorney Amidon brought anti-SLAPP motions. Each attorney argued that the instant action was brought in retaliation for the attorneys' pursuit of legitimate claims and bad faith actions against Farmers. As to the issue of whether the conduct for which they were sued was protected by the anti-SLAPP statute,[12] each attorney made a slightly different

---

[9] The schemes were allegedly different due to the participants. The 2003 wildfire scheme was alleged to have involved Attorney Anapol, the 2008 and 2009 wildfire scheme was alleged to have involved Attorney Amidon, and the 2007 wildfire scheme was alleged to have involved both attorneys. The parties ultimately stipulated to strike the allegations against Attorney Anapol from the 2007 wildfire scheme.

[10] With respect to each scheme, Farmers also alleged a cause of action for violation of Business and Professions Code section 17200. As the parties agree that the causes of action for violation of Business and Professions Code section 17200 rise and fall with the causes of action for violation of Insurance Code section 1871.7, we limit our discussion to Insurance Code section 1871.7.

[11] Insurance Code section 1871.7, subdivision (b) also incorporates by reference Penal Code section 549. Penal Code section 549 prohibits any person from soliciting, accepting or referring any business "with the knowledge that, or with reckless disregard for whether, the individual or entity for or from whom the solicitation or referral is made, or the individual or entity who is solicited or referred, intends to violate [Penal Code] Section 550 . . . ." Farmers also alleged violation of this section.

[12] As we shall discuss, resolution of an anti-SLAPP motion requires a two-pronged analysis. The movant has the burden to establish that the action arises out of protected conduct and the respondent then has the burden to establish a probability of prevailing. As we will ultimately resolve this appeal on the first prong only, we do not discuss the evidence submitted by the parties on the second prong. We note, however, that the evidence submitted by the attorneys consisted largely of declarations of themselves and their clients denying any wrongdoing and asserting the insurance claims were meritorious.

argument.[13] Attorney Anapol argued that all of his alleged conduct underlying Farmers's complaint was protected prelitigation conduct, as his submission of claims constituted prelitigation negotiations to settle the smoke and ash claims without the need of lawsuits. In support of his motion, Attorney Anapol submitted a declaration indicating that of the 42 insurance claims at issue from the 2003 wildfire, 29 were settled, five were ultimately dropped, and eight were resolved in favor of the insureds after arbitration.

Attorney Amidon, in contrast, argued that his alleged conduct constituted *both* protected petitioning activity and protected speech. As to petitioning conduct, Attorney Amidon argued that the submission of the claims constituted prelitigation conduct as each claim ultimately did ripen into a bad faith lawsuit. Attorney Amidon also argued that the submission of claims constitutes prelitigation conduct as the submission of a claim is a statutory prerequisite to proceeding to arbitration or litigation. As to the issue of protected speech, Attorney Amidon argued that his supposed capping activity constituted protected speech on an issue of public interest, in that soliciting clients constitutes speech and the wildfires were of considerable public interest.

The issues in this case became focused when Farmers responded with a motion to strike the attorneys' anti-SLAPP motions. Farmers argued that the motions were frivolous, as they were barred by the holding in *BPC* that the submission of insurance claims does not constitute prelitigation conduct. Farmers's motion was ultimately denied. However, in response to the motion, Attorney Amidon argued that his submission of claims was not the routine submission of insurance claims in the ordinary course of business, but the submission of claims as a necessary prerequisite to *inevitable* litigation. He submitted an additional declaration, in which he stated that, by late 2009, Farmers "was denying virtually every claim with little if any scrutiny. Therefore, it was then clear to me litigation would be necessary. My submitting claims after approximately mid-2009[14] was simply to comply with statutory requirements . . . as a prerequisite to inevitable litigation."

### 4. *Farmers's Opposition*

In opposition to the motions, Farmers argued that the attorneys' activity at issue in its complaint was not protected petitioning activity. Farmers relied heavily on *BPC* for this argument.

---

[13] At times, however, each attorney joined in the other's arguments.

[14] Exhibits to the first amended complaint identify the specific insurance claims at issue. There appear to be 150 claims reported to Farmers by Attorney Amidon prior to June 1, 2009, and 12 such claims reported to Farmers by Attorney Amidon after that date.

### 5. *The Attorneys' Replies*

By the time of their replies, both attorneys were arguing that the claims were submitted as necessary prerequisites to anticipated lawsuits. Attorney Anapol submitted a supplemental declaration stating that, when he began work on smoke and ash claims, he had years of experience suing insurance companies for bad faith and he knew that Farmers had a history of bad faith denial of these types of claims. He stated, "When I wrote the initial letters to Farmers on behalf of each client, I knew I had a reasonable good faith belief that it was the first step in a long process which would include bad faith litigation, involving many if not all of the claims. The initial letters I wrote to Farmers on behalf of each client . . . , were not only signed by me and sent from my office, but were necessary first steps in the pre-litigation process." He further stated, "Fully anticipating litigation from the moment I was retained by each and every client, I nevertheless had to see them through the claims process, which included a proof of loss, which necessarily had to be based upon an estimate, which was then used as the basis for the damages claims explored in the Examinations Under Oath, again necessary prerequisites to the upcoming lawsuits."

Attorney Amidon, however, again relied on Farmers's alleged decision to deny all claims in mid-2009. He argued, "In this case, the insurance claims were all submitted under circumstances where litigation was contemplated in good faith. The evidence establishes that at a point in the second quarter of 2009 Farmers essentially stopped paying smoke and ash claims. Farmers had made an institutional decision that virtually all smoke and ash claims would be automatically denied. This caused [Attorney] Amidon to complain to [the Department of Insurance] on behalf of approximately 170 Farmers'[s] insureds. Many of the 162 claims were submitted after that date. Likewise, on December 31, 2009, [Attorney] Amidon sued Farmers for bad faith on behalf of approximately 175 homeowners making smoke and ash claims. Many claims were made thereafter.[15] [¶] Hence, many claims were made when litigation was far more than a mere 'possibility.' Rather, such claims made to Farmers in this context were made simply to comply with the statutory prerequisite of making a claim . . . as a pre-condition to an inevitable lawsuit." (Original underscoring.)

Attorney Amidon also pursued his argument that obtaining clients constituted protected speech on an issue of public interest. He further argued that submitting the claims likewise constituted speech on an issue of public interest.

---

[15] Of the 162 claims made by Attorney Amidon at issue in this case, seven were made in 2010.

6. *The Trial Court's Ruling*

The trial court concluded that there was a conflict in the law between *BPC* and other cases which provides support for the conclusion that prelitigation communications made in anticipation of litigation constitute protected speech. The court ultimately chose to follow *BPC*. The court explained, "To rule otherwise is to contemplate that all commercial transactions—be they the purchase of a car or a house, the hiring of a new employee, or the retention of a doctor—are covered by this statute just because human experience alerts us to the possibility that there may potentially be a Lemon Law case, a construction defect case, an employment discrimination case or a medical malpractice case resulting from such otherwise routine business activity." Concluding that the conduct alleged in the complaint did not constitute protected activity, the trial court denied the anti-SLAPP motions. The attorneys filed timely notices of appeal.

## *ISSUES ON APPEAL*

The main issue raised by the parties is whether *BPC* completely bars all insurance claims from ever constituting prelitigation conduct. We conclude that it does not; instead, submitting an insurance claim in the usual course of business does not constitute prelitigation conduct, but circumstances may exist such that submitting the claim is protected prelitigation conduct. We next consider whether the attorneys have met their burden of establishing a prima facie case that the claims submitted in this case constitute prelitigation conduct; we conclude that they did not. Finally, we consider and reject the attorneys' other arguments that Farmers's complaint is based on protected speech or petitioning conduct.

## *DISCUSSION*

1. *Standard and Scope of Review*

The Legislature enacted the anti-SLAPP law in order to address the "disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (Code Civ. Proc., § 425.16, subd. (a).) To that end, the statute provides that "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a

public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (*Id.*, § 425.16, subd. (b)(1).)

■ Thus, there is a two-step process for evaluating an anti-SLAPP motion. " 'First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. The moving defendant's burden is to demonstrate that the act or acts of which the plaintiff complains were taken "in furtherance of the [defendant]'s right of petition or free speech under the United States or California Constitution in connection with a public issue," as defined in the statute. [Citation.] If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim.' [Citation.]" (*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 669 [35 Cal.Rptr.3d 31].) "On appeal, we review the trial court's decision de novo, engaging in the same two-step process to determine, as a matter of law, whether the defendant met its initial burden of showing the action is a SLAPP, and if so, whether the plaintiff met its evidentiary burden on the second step. [Citation.]" (*Tuszynska v. Cunningham* (2011) 199 Cal.App.4th 257, 266–267 [131 Cal.Rptr.3d 63].)

■ We are here concerned with the first step. "In the first step of the anti-SLAPP analysis, the court decides only whether the claims arise from protected activity. The court reviews the parties' pleadings, declarations and other supporting documents to determine what conduct is actually being challenged, not to determine whether the conduct is actionable." (*Coretronic Corp. v. Cozen O'Connor* (2011) 192 Cal.App.4th 1381, 1389 [121 Cal.Rptr.3d 254].) "The defendant need not prove that the challenged conduct is protected by the First Amendment as a matter of law; only a prima facie showing is required." (*Id.* at p. 1388.)

■ " 'Our Supreme Court has recognized the anti-SLAPP statute should be broadly construed [citation] and that a plaintiff cannot avoid operation of the anti-SLAPP statute by attempting, through artifices of pleading, to characterize an action as a garden variety tort or contract claim when in fact the claim is predicated on protected speech or petitioning activity. [Citation.]' " (*Tuszynska v. Cunningham, supra,* 199 Cal.App.4th at p. 267.) At the same time, "a defendant in an ordinary private dispute cannot take advantage of the anti-SLAPP statute simply because the complaint contains some references to speech or petitioning activity by the defendant." (*Martinez v.*

*Metabolife Internat., Inc.* (2003) 113 Cal.App.4th 181, 188 [6 Cal.Rptr.3d 494].) Determining whether a cause of action arises from protected speech or petitioning activity requires a focus on the *principal thrust* or *gravamen* of the cause of action. If the allegations of protected activity are merely incidental to a cause of action based essentially on nonprotected activity, the allegations will not transform the nonprotected cause of action into an action subject to the anti-SLAPP law. (*Tuszynska v. Cunningham, supra,* 199 Cal.App.4th at p. 267; *Thomas v. Quintero* (2005) 126 Cal.App.4th 635, 653 [24 Cal.Rptr.3d 619].) The focus on the gravamen of the action does not implicate "some philosophical thrust or legal essence of the cause of action." (*Wallace v. McCubbin* (2011) 196 Cal.App.4th 1169, 1190 [128 Cal.Rptr.3d 205].) Instead, courts are to focus on the acts on which liability is alleged to be based. (*Ibid.*)

■  Moreover, courts must be careful to distinguish allegations of conduct on which liability is to be based from allegations of motives for such conduct. "[C]auses of action do not arise from motives; they arise from acts." (*Wallace v. McCubbin, supra,* 196 Cal.App.4th at p. 1186.) "The statute applies to claims 'based on' or 'arising from' statements or writings made in connection with protected speech or petitioning activities, regardless of any motive the defendant may have had in undertaking its activities, or the motive the plaintiff may be ascribing to the defendant's activities." (*Tuszynska v. Cunningham, supra,* 199 Cal.App.4th at p. 269.) Similarly, a court ruling on an anti-SLAPP motion must distinguish between allegedly wrongful acts and evidence of those acts. "Where the defendant's protected activity will only be used as evidence in the plaintiff's case, and none of the claims are based on it, the protected activity is only incidental to the claims," and will therefore not support an anti-SLAPP motion. (*Coretronic Corp. v. Cozen O'Connor, supra,* 192 Cal.App.4th at pp. 1388–1389.)

It is also important to treat each claim on its own facts. "There is simply no authority for creating a categorical exception [from the anti-SLAPP law] for any particular type of claim . . . ." (*Beach v. Harco National Ins. Co.* (2003) 110 Cal.App.4th 82, 91 [1 Cal.Rptr.3d 454] (*Beach*).)

### 2. *Prelitigation Conduct*

■  Code of Civil Procedure section 425.16, subdivision (e) sets forth four types of communications or conduct which are considered acts in furtherance of a person's right of speech or petition.[16] At issue in this case

---

[16] While the anti-SLAPP statute and the absolute litigation privilege of Civil Code section 47, subdivision (b) are substantively different statutes that serve different purposes, courts have looked to the litigation privilege as an aid in construing the scope of Code of Civil Procedure section 425.16 with respect to the first prong of the anti-SLAPP inquiry. (*Feldman v. 1100 Park*

are subdivision (e)(1) and (2), which describe as an act in furtherance of the right of petition any written or oral statement or writing made "before" a judicial proceeding or "in connection with" an issue under consideration or review by a judicial body.[17] A defendant's conduct may be protected petitioning activity even if the statement was not made on the defendant's own behalf. (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1116 [81 Cal.Rptr.2d 471, 969 P.2d 564].) A statement may be entitled to protection if made on behalf of the defendant's client. (*Ibid.*)

■ Although the statutory language refers to litigation then pending, it has been interpreted to apply to prelitigation statements. (*Neville v. Chudacoff* (2008) 160 Cal.App.4th 1255, 1266 [73 Cal.Rptr.3d 383].) Communications preparatory to, or in anticipation of, bringing an action are within the protection of the anti-SLAPP statute. (*Bailey v. Brewer* (2011) 197 Cal.App.4th 781, 789 [128 Cal.Rptr.3d 380].) If a prelitigation statement concerns the subject of the dispute and is made in anticipation of litigation contemplated in good faith and under serious consideration, it falls within the scope of Code of Civil Procedure section 425.16. (*Bailey v. Brewer, supra*, 197 Cal.App.4th at pp. 789–790.) The "good faith [and under] serious consideration" requirement is not a test for malice. (*Aronson v. Kinsella* (1997) 58 Cal.App.4th 254, 266 [68 Cal.Rptr.2d 305].) Instead, it focuses on whether the litigation was genuinely contemplated. (*Feldman v. 1100 Park Lane Associates, supra*, 160 Cal.App.4th at p. 1487.) The requirement guarantees that hollow threats of litigation are not protected. (*Ibid.*)

■ In certain types of actions, it is necessary to serve or record a document prior to the commencement of litigation. In such a case, the satisfaction of the statutory prerequisite is considered to constitute protected prelitigation conduct. (*Salma v. Capon* (2008) 161 Cal.App.4th 1275, 1285 [74 Cal.Rptr.3d 873] [recording of a notice of rescission as a necessary prerequisite to filing a rescission action]; *Feldman v. 1100 Park Lane Associates, supra*, 160 Cal.App.4th at p. 1480 [service of a three-day notice to quit as a statutory prerequisite to filing an unlawful detainer action]; *Birkner v. Lam*

---

*Lane Associates* (2008) 160 Cal.App.4th 1467, 1479 [74 Cal.Rptr.3d 1].) Thus, some of the authority from which we draw our conclusions regarding whether prelitigation statements constitute petitioning activity protected by the anti-SLAPP statute were not anti-SLAPP cases, but instead considered whether the statements at issue were privileged under the absolute litigation privilege.

[17] When the underlying activity charged in the complaint is the defendant's *conduct* as opposed to *statements*, the defendant can rely on subdivision (e)(4) of the anti-SLAPP statute, which defines as protected petitioning activity "any other conduct in furtherance of the exercise of the constitutional right of petition . . . ." (Code Civ. Proc., § 425.16, subd. (e)(4).)

(2007) 156 Cal.App.4th 275 [67 Cal.Rptr.3d 190] [service of a notice terminating tenancy as a legal prerequisite to filing an unlawful detainer action].) Similarly, when an attorney seriously and in good faith contemplates litigation, and sends the opposing party a demand letter, the demand letter has been held to constitute a protected prelitigation statement. (*Aronson v. Kinsella, supra*, 58 Cal.App.4th at p. 270.)

In the instant case, the attorneys argue that the submission of an insurance claim constitutes protected petitioning conduct as both a necessary prerequisite to litigation and prelitigation demand letter. Before turning to these arguments, however, we first discuss *BPC* and the existing authority regarding whether insurance claims constitute protected prelitigation conduct.

### 3. *Insurance Claims and* BPC

In *BPC*, Division Four of the Second Appellate District considered whether the submission of documents to an insurer in support of a claim constitutes protected prelitigation activity. The defendants had been sued for preparing false and fraudulent damage reports and repair estimates, which were submitted to an insurer. If the insurer did not pay on the claims, the claims were taken to the appraisal process and, if necessary, litigation was commenced. (*BPC, supra*, 86 Cal.App.4th at p. 282.) The defendants brought an anti-SLAPP motion, arguing that the damage reports were prelitigation conduct as they were prepared for submission to clients, who ultimately submitted them in support of their insurance claims. The defendants declared that " '[t]he majority of these damage reports were prepared in anticipation of litigation.' " (*Id.* at p. 284.) The trial court denied the anti-SLAPP motion, and the Court of Appeal affirmed. The court stated, "Here, the damage reports were sent to [the insurer] to demand performance on the insurance contract. At the time defendants created and submitted their reports and claims, there was no 'issue under consideration' pending before any official proceeding. If we protect the reports and claims under [Code of Civil Procedure] section 425.16 because they eventually could be used in connection with an official proceeding, we would effectively be providing immunity for any kind of criminal fraud so long as the defrauding party was willing to take its cause to court. Defendants have cited nothing to us that demonstrates the anti-SLAPP law embraces such actions. We are satisfied it does not." (*Id.* at p. 285.)

*BPC* was cited favorably in *Kajima Engineering & Construction, Inc. v. City of Los Angeles* (2002) 95 Cal.App.4th 921 [116 Cal.Rptr.2d 187] (*Kajima*). The complaint in *Kajima* did not involve the submission of

insurance claims, but was instead concerned with a contractor's alleged submission of inflated construction claims in connection with a public project. In rejecting the contractor's argument that the submission of inflated construction claims constituted protected petitioning conduct, Division Seven of the Second Appellate District cited *BPC* for the proposition that "[t]he submission of contractual claims for payment in the regular course of business before the commencement of litigation simply is not an act in furtherance of the right of petition or free speech within the meaning of the anti-SLAPP statute." (*Kajima, supra*, 95 Cal.App.4th at p. 932.)

While *BPC* and *Kajima* were concerned with the submission of claims and documents in support of claims, the question has also arisen as to whether an insurer's claims handling practices constitute prelitigation conduct protected by the right of petition. In *Beach, supra*, 110 Cal.App.4th 82, an insured sued his insurer for bad faith, arising out of the insurer's delays and other misconduct in handling his claim under his policy's uninsured motorist coverage. First, the court recognized that the right of petition "is not one way. Just as a plaintiff invokes the right of petition by filing a lawsuit or seeking administrative action, a defendant, when responding to such an action, exercises the same constitutional right." (*Id.* at pp. 93–94.) However, the court found no petitioning activity implicated by the allegations against the insurer. "While communications preparatory to bringing (or responding to) an action or arbitration might, under the proper circumstances, be deemed to fall within the scope of section 425.16 [citations], the conduct complained of here does not cross this threshold. The outlined actions (or nonactions) occurred as part of a coverage dispute between an insurer and its insured, and occurred long before any arbitration or other proceeding commenced. [Citation.] Nothing had yet happened to which a right to petition attached. While we have no quarrel with [the insurer]'s claim that an insurer is entitled to defend itself against unmeritorious claims, the fact that a dispute exists that might ultimately lead to arbitration does not make every step in that dispute part of a right to petition. Just as plaintiff could not claim that his petitioning rights were invoked the moment he submitted a claim to [the insurer] [citation], [the insurer] cannot claim that the submission of plaintiff's claim immediately gave rise to [the insurer]'s own petitioning activities." (*Id.* at pp. 94–95.)

4. *An Insurance Claim Can Constitute Protected Petitioning Activity Under the Proper Circumstances*

Despite the arguments of the attorneys, we see no conflict between *BPC, Kajima*, and *Beach* on one side and the authority regarding statutory prerequisites to litigation and demand letters on the other. The issue is not if

an insurance claim in the abstract does or does not constitute protected prelitigation activity as a matter of law. Instead, one must consider whether the circumstances of any particular insurance claim bring it within the realm of protected prelitigation activity. Thus, we believe *Kajima* properly understood *BPC* to stand for the proposition that "[t]he submission of contractual claims for payment *in the regular course of business*" is not an act in furtherance of the right of petition. (*Kajima, supra,* 95 Cal.App.4th at p. 932, italics added.) However, when the claim is submitted under circumstances demonstrating that the claim was not submitted for payment in the regular course of business, but was instead merely a necessary prerequisite to expected litigation or was submitted as the equivalent of a prelitigation demand letter, it may constitute protected petitioning activity.

This conclusion is mandated by the somewhat hybrid nature of an insurance claim. The attorneys argue that submission of an insurance claim is a necessary prerequisite to litigation. This is true. (Ins. Code, § 2071 [the standard form policy of fire insurance in Cal. requires claim submission and provides that suit cannot be brought unless there has been compliance with the requirements of the policy].) However, it is also true that submission of an insurance claim is a necessary prerequisite to obtaining performance under the insurance contract. Indeed, the submission of a claim is often the first time an insurer becomes aware that its insured seeks payment under the contract. Thus, it cannot be determined, by the mere fact of submission of a claim, that the claim has been submitted merely for adjusting or if it has been submitted in anticipation of litigation contemplated in good faith and under serious consideration.

■ We can certainly envision circumstances in which an insurance claim is submitted in anticipation of litigation contemplated in good faith and under serious consideration. For example, a claim may be submitted after *informal* negotiations with the insurance company have proven unfruitful, and the insured has already decided to bring suit on the policy. In those circumstances, submission of the claim would be nothing more than the satisfaction of the statutory prerequisite for a suit. Similarly, an insured that has already been informed that its claim will be denied may submit the claim in the language of a demand letter, threatening suit if the claim is not paid in full. There, too, submission of the claim would qualify as a protected prelitigation statement in furtherance of the right of petition.

We hasten to add, however, that such circumstances are the exception, rather than the rule. In most cases, the insurer is not aware that the insured will be making a claim until the claim is made; thus, the insured will have no

reason to believe the claim will be denied and litigation will follow. In the usual course, while litigation for failure to pay the claim is a *possibility*, it is no more of a possibility than in any case where one party to a contract requests the other party to perform its duties under the agreement. That possibility of litigation in the event of nonperformance is not enough to conclude the claim is made in anticipation of litigation contemplated in good faith and under serious consideration.

### 5. *The Attorneys Have Not Made a Prima Facie Showing That the Claims Were Protected Prelitigation Statements*

In this case, Attorney Anapol and Attorney Amidon both argue that the claims submitted in this case were protected prelitigation statements. They rely solely on their declarations for this conclusion.[18] Neither has made a sufficient showing.

### a. *Attorney Anapol*

Attorney Anapol has failed to establish a prima facie showing that the claims he submitted in connection with the 2003 wildfires were submitted in anticipation of litigation contemplated in good faith and under serious consideration for the simple reason that his declarations are contradictory. In a declaration filed with his reply in support of his anti-SLAPP motion, Attorney Anapol ultimately stated, "When I wrote the initial letters to Farmers on behalf of each client, I knew I had a reasonable good faith belief that it was the first step in a long process which would include bad faith litigation, involving many if not all of the claims" and that he was "[f]ully anticipating litigation from the moment I was retained by each and every client." However, this is not what he originally stated in support of his anti-SLAPP motion. Instead, he initially argued that his claims were "good faith pre-litigation negotiations that could have settled the disputed smoke and ash claims without the need of a lawsuit." Far from declaring that each claim was submitted with the expectation of litigation, Attorney Anapol declared that most of the claims were, in fact, settled without litigation. Indeed, Attorney Anapol declared that, after the claims were submitted, Farmers "thoroughly investigated each claim" and that he sent demand letters to Farmers threatening lawsuits "[f]ollowing [Farmers's] protracted investigation." In short, while these demand letters following investigation likely constituted protected prelitigation conduct, the insurance claims—which simply sought settlement—did not. In light of Attorney Anapol's declaration in support of his anti-SLAPP motion, his subsequent declaration to the contrary cannot constitute prima facie evidence of an anticipation of litigation.

---

[18] While both attorneys submitted declarations from their clients in support of their anti-SLAPP motions, none of the declarations indicate that at the time the claim was submitted, the client seriously anticipated suing Farmers.

b. *Attorney Amidon*

Attorney Amidon, in contrast, makes no argument with respect to the vast majority of the 162 claims underlying the complaint against him. Instead, Attorney Amidon declared that, in mid-2009, Farmers had made an institutional decision to deny virtually all smoke and ash claims and that, as a result, all of the claims he submitted after that date were submitted with the expectation that they would be denied and litigation was inevitable. As we noted above (see fn. 14, *ante*), only 12 of the 162 claims were submitted after mid-2009. Thus, Attorney Amidon's argument does not apply to the remaining 150 claims. Nonetheless, we cannot say that the allegations regarding the 12 claims submitted after mid-2009 are merely incidental to Farmers's complaint. Thus, we must consider whether Amidon has made a prima facie showing that those 12 claims were submitted in anticipation of litigation contemplated in good faith and under serious consideration.

Amidon's evidence, as set forth in his declarations, is as follows: In October 2009, there was "a greatly increased incidence of Farmers'[s] outright refusal to even look at or consider smoke and ash claims brought by insureds as a result of the 2007 and 2008 California Wildfires. . . . As of that time, Farmers was denying virtually every claim with little if any scrutiny. Therefore, it was then clear to me litigation would be necessary." Attorney Amidon also declared that he "had received numerous reports from law offices and others evidencing that Farmers had made an institutional decision not to pay on any smoke and ash claims. Many comments by Farmers'[s] adjusters had been reported to me, which affected my view of how Farmers was handling claims, and thereby influenced my resolve and intent in connection with those claims." He declared there were "reports from different sources that Farmers was making statements such as 'I do not know why you continue to do these claims when you know we are not going to pay out on them.' "[19]

■ We believe that an insurance claim cannot be transformed from a simple claim for payment submitted in the usual course of business into protected prelitigation conduct solely on the basis of the subjective intent of the attorney submitting the claim, particularly when that viewpoint is based on the insurer's treatment of *other* claims. Whether a particular insurance claim constitutes a claim in the usual course of business or the mere satisfaction of a prerequisite for litigation should not turn on the experience and uncommunicated opinion of the attorney.

---

[19] This statement is clearly hearsay, if offered for the truth of the matter.

In this case, there is no evidence that Attorney Amidon informed Farmers of his belief that any post-June-2009 claim would be denied; no evidence that the *insureds* anticipated litigation at the time Attorney Amidon submitted their claims;[20] and no admissible evidence that Farmers informed Attorney Amidon that the claims would be denied so he should proceed directly to litigation. Attorney Amidon relies solely on his self-serving declaration that, in his own mind, at the time he submitted the claims, his mindset was that the claims would likely be denied and litigation would be necessary. This is insufficient to establish a prima facie showing. (Cf. *Wallace v. McCubbin, supra,* 196 Cal.App.4th at p. 1186 [our focus is on the acts giving rise to the cause of action, not the motive for those acts.].)

### 6. *The Attorneys' Alternative Arguments for Protected Speech or Petitioning Conduct Fail*

Having concluded that the submission of insurance claims in this case was not a statement or act in furtherance of the right of petition, we briefly address the attorneys' alternative arguments.

█ First, we note that the principal thrust or gravamen of the Insurance Code section 1871.7 causes of action against the attorneys is the attorneys' alleged use of cappers and submission of false claims (and/or false documents in support of claims). To the extent the attorneys argue that the allegations of fee splitting with Sims constitute petitioning activity, the attorneys improperly confuse the *evidence* of allegedly wrongful acts with the alleged acts themselves. Insurance Code section 1871.7 is not violated by fee splitting; it is violated by capping and submitting false claims. While the fee splitting may be evidence of capping, it is capping which is the gravamen of the complaint. Similarly, to the extent the attorneys argue that Farmers's complaint against them incorporates the entire course of their representation of the insureds, which, in many cases, matured into litigation, we again note that the gravamen of the complaint is capping and the submission of false claims only. Finally, to the extent the attorneys argue that Farmers brought the instant action to retaliate against them for pursuing bad faith actions against Farmers, they improperly confuse the *motive* for the action with the *acts* upon which it is based. The anti-SLAPP statute focuses only on the acts which support the complaint, not the motive for which the complaint may have been brought.

█ Second, as we have rejected the attorneys' argument that the submission of the claims constituted protected petitioning activity, it likewise

---

[20] We question whether Attorney Amidon could have anticipated litigation in good faith and under serious consideration at the time he submitted the claims if his clients did not also share that anticipation at that time.

follows that the attorneys' conduct in obtaining clients to submit those claims also did not constitute petitioning activity. It is true that if an attorney contemplating litigation contacts prospective clients and discusses with them the merits of the proposed action, that conduct is protected petitioning activity. (*Rubin v. Green* (1993) 4 Cal.4th 1187, 1195 [17 Cal.Rptr.2d 828, 847 P.2d 1044]; see *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman* (1996) 47 Cal.App.4th 777, 780, 784 [54 Cal.Rptr.2d 830] [attorney contemplated filing a complaint with the Attorney General's office].) However, we have concluded that the attorneys in this case have failed to establish that the clients were initially contacted for anything other than *filing claims*. As the filing of a claim is not generally petitioning activity, obtaining clients for filing claims is also not petitioning activity.

Third, the attorneys argue that their statements and conduct involved in submitting claims and obtaining clients constitute protected speech in connection with an issue of public interest.[21] The attorneys argue that the Southern California wildfires were indisputably issues of public interest. Similarly, they argue that the business of insurance, which is heavily regulated, is a matter of public concern. We do not disagree that both the wildfires and the business of insurance are matters of public interest. However, none of the statements or acts of the attorneys which form the basis for Farmers's complaint were made in connection with these issues. The attorneys allegedly used cappers to find clients to bring *individual claims* against their insurers for *damages to their homes* individually suffered in the fires. Such claims are indisputably private in nature.[22]

## 7. *Conclusion*

As the attorneys have failed to make a prima facie showing that the conduct underlying Farmers's complaint arises from protected acts of petitioning or speech, the anti-SLAPP statute does not apply. The trial court's order denying the anti-SLAPP motions will be affirmed.

---

[21] Code of Civil Procedure section 425.16, subdivision (e)(4) protects "any other conduct in furtherance of the exercise of . . . the constitutional right of free speech in connection with a public issue or an issue of public interest."

[22] The attorneys suggest that the claims must be an issue of public interest because Farmers allegedly issued a press release announcing this lawsuit and seeks attorney fees under Code of Civil Procedure section 1021.5 on the basis that this action "will significantly benefit the general public" by enjoining defendants from their unfair business practices. The conclusion does not follow. That a lawsuit allegedly revealing and enjoining a huge insurance fraud ring may be a matter of public interest does not mean that each fraudulent claim submitted was also a matter of public interest.

## *DISPOSITION*

The orders are affirmed. Farmers shall recover its costs on appeal.

Kitching, J., and Aldrich, J., concurred.

Petitions for a rehearing were denied January 3, 2013, and the petitions of both appellants and respondents for review by the Supreme Court were denied March 20, 2013, S208009.