Filed 4/30/21  Dutton v. Ouriel CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JAMES DUTTON et al., | B305386 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. 19SMCV00329) |
| v. | |
| ROBERT OURIEL, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mark A. Young, Judge.  Affirmed.

Edward Weinhaus; Adam Florek (*pro hac vice*) for Defendant and Appellant.

Law Office of D. Joshua Staub and D. Joshua Staub for Plaintiffs and Respondents.

\* \* \* \* \* \*

An elderly couple made a friend a short-term loan of $427,000, and the friend absconded with the money. The couple then sued the man who helped their friend persuade the bank into which she had deposited the money to release the funds to her. The man filed a motion to strike the claims against him under our anti-SLAPP statute (Code Civ. Proc., § 425.16).[1] The trial court denied the motion. This was the correct ruling, so we affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I.    Facts

In early 2017, Rodica Marinescu (Marinescu) was a friend of James and Patricia Dutton (collectively, the Duttons).[2]

In January 2017, Marinescu told the Duttons that she was the one-third owner of a property in Los Angeles, California; that she wanted to "buy out" the owners of the remaining two-thirds' interest in the property; and that she needed a balance of $427,000 in her bank account as proof that she had the financial wherewithal to purchase that interest. Marinescu asked the Duttons if they would temporarily loan her the $427,000 needed for the "proof of funds" verification, which she would pay them back once the verification issued.

The Duttons agreed, and James wrote Marinescu a check for $427,000 on Valentine's Day 2017. That same day, Marinescu deposited the check into her bank account at Wells Fargo Bank

---

[1]    "SLAPP" stands for "Strategic Lawsuit Against Public Participation."
All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

[2]    Individually, however, we will refer to the Duttons by their first names to avoid confusion. We mean no disrespect.

(Wells Fargo).  Three days later, Wells Fargo issued a "proof of funds" letter verifying the balance in Marinescu's account.

Something then happened that Marinescu did not intend: Wells Fargo "flagged" the check "for close[] review."  Until Wells Fargo completed its verification of the "issuance and the intent" of James's check, it "froze" the check by prohibiting any withdrawal against those funds.

Marinescu immediately undertook efforts to get Wells Fargo to unfreeze those funds through what, as the Duttons later alleged, were a series of "false statements" and omissions that "misrepresent[ed the] transaction concerning the $427,000."  Specifically, Marinescu visited the Santa Monica branch of Wells Fargo to ask them to unfreeze the funds; she thereafter had someone place a phone call to a Wells Fargo corporate official on her behalf asking the bank to release the funds for withdrawal; and, as a follow-up to the call, she had her real estate broker send a letter on the letterhead of a brokerage company called Partners Trust formally requesting the funds to be released.  In the letter, the real estate broker represented that the $427,000 check was the first disbursement of a $900,000 loan that the Duttons had made to Marinescu to assist her in purchasing a *different* property, and "respectfully request[ed] that Wells Fargo immediately release [Marinescu's] funds" because the freeze rendered the "proof of funds" invalid and "continu[ed] to greatly damage many parties' economic interests."  The letter did not mention or even hint at possible litigation.

After receiving the letter, Wells Fargo lifted the freeze on the $427,000 check.  Marinescu immediately withdrew the funds and refused to return any of the money to the Duttons.

Marinescu had enlisted Robert Ouriel (Ouriel) to assist her and the real estate broker in their efforts to persuade Wells Fargo to unfreeze the Duttons's $427,000 check. Specifically, Ouriel had accompanied Marinescu on her visit to the Santa Monica branch of Wells Fargo; he may have placed the phone call to the Wells Fargo corporate official; and he had either partially or entirely drafted the letter sent to Wells Fargo.

Although Ouriel was an attorney in Florida at that time (he was subsequently disbarred), he was not at that time (and had never been) a member of the State Bar of California and was not at that time authorized to practice law before any federal courts.

## II. Procedural Background

In February 2019, the Duttons sued Marinescu's real estate broker, Ouriel, and Partners Trust for (1) aiding and abetting Marinescu's fraud, and (2) financial elder abuse because the Duttons were in their 70s and 80s.[3] (The Duttons had already sued Marinescu in a separate lawsuit, which was later deemed related to this case.)

Representing himself, Ouriel filed a motion to strike the claims against him under the anti-SLAPP statute. Following briefing, and a hearing in January 2020, the trial court denied the motion to strike after concluding that the Duttons's claim did not rest on activity protected by the anti-SLAPP statute.

Ouriel filed this timely appeal.

---

[3] The Duttons also sued Wells Fargo for "breach of duty," but Wells Fargo demurred, and the Duttons dropped their claim against Wells Fargo in their subsequently filed first amended complaint.

## DISCUSSION

Ouriel argues that the trial court erred in denying his motion to strike under the anti-SLAPP statute. We independently review a trial court's anti-SLAPP analysis (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3), and are accordingly not bound by the trial court's ruling or rationale (*Rutgard v. City of Los Angeles* (2020) 52 Cal.App.5th 815, 825). Because Ouriel has not on appeal challenged any of the trial court's evidentiary rulings, we will consider only the evidence that the trial court considered. (*Abir Cohen Treyzon Salo, LLP v. Lahiji* (2019) 40 Cal.App.5th 882, 889-891 (*Lahiji*).)

## I.    The Anti-SLAPP Statute
### A.    *Generally*

The anti-SLAPP statute "provides a procedure for weeding out, at an early stage, *meritless* claims arising from" activity that is protected by that statute. (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384.) "Accordingly, a trial court tasked with ruling on an anti-SLAPP motion must ask two questions: (1) has the moving party 'made a threshold showing that the challenged cause of action arises from protected activity' [citation], and, if so, (2) has the nonmoving party 'established . . . a probability that [they] will prevail' on the challenged cause of action by showing that the claim has 'minimal merit' [citations]?" (*Lahiji, supra*, 40 Cal.App.5th at p. 887.)

The first question—that is, whether a cause of action arises from protected activity—"turns on two subsidiary questions: (1) What conduct does the challenged cause of action 'arise[] from'; and (2) is that conduct 'protected activity' under the anti-SLAPP statute?" (*Mission Beverage Co. v. Pabst Brewing Co., LLC* (2017) 15 Cal.App.5th 686, 698 (*Mission Beverage*).) "A cause of action

5

'arises from' protected activity when the 'cause of action *itself*' is '*based on*' protected activity. [Citations.] Whether a cause of action is itself based on protected activity turns on whether its ""*principal thrust or gravamen*""" is protected activity—that is, whether the "'core injury-producing conduct'" warranting relief under that cause of action is protected activity." (*Id.*, quoting *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78; *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1114 (*Briggs*); *Colyear v. Rolling Hills Community Assn. of Rancho Palos Verdes* (2017) 9 Cal.App.5th 119, 134.) What conduct "is protected under the anti-SLAPP statute" turns "not [on] First Amendment law, but [rather on] the statutory definitions in . . . section 425.16, subdivision (e)." (*City of Montebello v. Vasquez* (2016) 1 Cal.5th 409, 422.) As pertinent here, subdivision (e) of section 425.16 defines protected activity to include "any written or oral statement or writing" made "before a legislative, executive, or judicial proceeding" or "in connection with an issue under consideration or review by a . . . judicial body, or any other official proceeding authorized by law." (§ 425.16, subd. (e)(1) & (2).)

In assessing whether a cause of action arises from protected activity, a trial court must consider "the pleadings" as well as the "supporting and opposing affidavits stating the facts upon which the liability or [a] defense is based." (§ 425.16, subd. (b)(2).) However, the pleadings are of "primary" importance because the plaintiff is the architect of his or her own complaint, such that the "core injury-producing conduct" at issue in a case is primarily a function of "what is pled—not what is proven." (*Bel Air Internet, LLC v. Morales* (2018) 20 Cal.App.5th 924, 936-937

(*Bel Air Internet*); *Comstock v. Aber* (2012) 212 Cal.App.4th 931, 942.)

**B.** ***Communications in connection with judicial and other proceedings***

By its plain terms, the definitions of protected activity that reach communications made "before a" "judicial proceeding" or "in connection with an issue under consideration or review by" a "judicial body" or "any other official proceeding authorized by law" encompass statements made directly to judicial, administrative, and arbitral tribunals as well as statements made to others that relate to ongoing proceedings before those tribunals. (*Briggs*, *supra*, 19 Cal.4th at p. 1115 [""basic act of filing litigation or otherwise seeking administrative action""; protected]; *Beach v. Harco National Ins. Co.* (2003) 110 Cal.App.4th 82, 94 (*Beach*) [same, as to arbitrations]; *Collier v. Harris* (2015) 240 Cal.App.4th 41, 54 [settlement demand letter; protected]; *O&C Creditors Group, LLC v. Stephens & Stephens XII, LLC* (2019) 42 Cal.App.5th 546, 566 (*O&C Creditors*) [settlement agreement; protected]; *Pettitt v. Levy* (1972) 28 Cal.App.3d 484, 490 [statements made during witness preparatory interviews; protected].)

These definitions of protected activity also reach "'communications preparatory to or in anticipation of the bringing of an action or other official proceeding'" (*Briggs*, *supra*, 19 Cal.4th at p. 1115), but only if those communications "relate[] to litigation that is contemplated in good faith and under serious consideration." (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1251 (*Action Apartment*); *Digerati Holdings, LLC v. Young Money Entertainment, LLC* (2011) 194 Cal.App.4th 873, 887 (*Digerati Holdings*).) Litigation is not "under serious consideration" if it is only a "possibility." (*Mission*

7

*Beverage, supra,* 15 Cal.App.5th at p. 703; *People ex rel. Fire Ins. Exchange v. Anapol* (2012) 211 Cal.App.4th 809, 827-828 (*Anapol*).)

Although courts have taken "'a fairly expansive view of what constitutes litigation-related activities'" qualifying as protected activity under the anti-SLAPP statute (*O&C Creditors, supra,* 42 Cal.App.5th at p. 566; *Neville v. Chudacoff* (2008) 160 Cal.App.4th 1255, 1268 (*Neville*)), "[n]ot all attorney conduct in connection with litigation, or in the course of representing clients, is protected" activity (*California Back Specialists Medical Group v. Rand* (2008) 160 Cal.App.4th 1032, 1037 (*California Back Specialists*); *Optional Capital, Inc. v. DAS Corp.* (2014) 222 Cal.App.4th 1388, 1400).  What distinguishes protected activity from unprotected activity is the *degree* of connection between the communication at issue and the anticipated litigation, and this degree of connection is evaluated on a case-by-case basis by examining a number of factors (*Anapol, supra,* 211 Cal.App.4th at p. 827).

First, courts examine the identity of the parties to the communication, including whether the communication was made by a practicing attorney capable of initiating litigation.  (*Neville, supra,* 160 Cal.App.4th at p. 1269 [letter sent on attorney's letterhead].)  In this regard, it is not enough that the recipient of a communication is a person who *could* be sued.  (*Anapol, supra,* 211 Cal.App.4th at p. 826 ["the fact that a dispute exists that might ultimately lead to arbitration does not make every step in that dispute part of a right to petition"]; *Beach, supra,* 110 Cal.App.4th at pp. 94-95.)

Second, courts examine whether the communication was a necessary prerequisite to any litigation.  (*Anapol, supra,* 211

8

Cal.App.4th at p. 827 [stating rule]; *Lunada Biomedical v. Nunez* (2014) 230 Cal.App.4th 459, 476-477 [sending notice required by Consumer Legal Remedies Act; protected]; *RGC Gaslamp, LLC v. Ehmcke Sheet Metal Co., Inc.* (2020) 56 Cal.App.5th 413, 426 [filing mechanic's lien prior to bringing foreclosure action; protected].)  However, a communication that is a necessary prerequisite to litigation is not protected activity where future litigation is also contingent on the failure of further negotiations or the failure to meet further contractual obligations.  (*Bel Air Internet*, *supra*, 20 Cal.App.5th at pp. 940-941 [so stating]; *Mission Beverage*, *supra*, 15 Cal.App.5th at pp. 703-704 [letter commencing end of distributor agreement prior to arbitration not protected where arbitration permissible only if good faith negotiations thereafter fail].)

Third, courts examine the content of the communication itself.

On the one hand, a communication is more likely to constitute protected activity if it (1) specifically threatens litigation (*Digerati Holdings*, *supra*, 194 Cal.App.4th at pp. 887-888 [statements made to film distributors "threatening them with litigation"; protected]; *Blanchard v. DIRECTV, Inc.* (2004) 123 Cal.App.4th 903, 909-910, 920-921 [letters warning recipients they were "violat[ing] federal law," seeking their cooperation, and "provid[ing]" them with "an opportunity to resolve the matter by way of settlement before commencement of suit"; protected]; *Aronson v. Kinsella* (1997) 58 Cal.App.4th 254, 260, 268 [letter demanding renouncement of false and misleading claims and disclosure of all persons to whom claims were made, and threatening to "'consider appropriate legal action'"; protected]); (2) contemplates the filing of litigation (*Wilcox v. Superior Court*

9

(1994) 27 Cal.App.4th 809, 814-815, 821-822 [letter asks recipients to contribute to cost of pursuing litigation; protected], overruled in part on other grounds as stated in *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 68, fn. 5; *Neville*, *supra*, 160 Cal.App.4th at p. 1269 [letter sent to third parties on lawyer's letterhead, with subject line "[plaintiff] v. [defendant]," and stating plaintiff will "aggressively pursue . . . all available remedies"; protected]); or (3) counsels or encourages others to initiate litigation (*Bel Air Internet*, *supra*, 20 Cal.App.5th at pp. 940, 943 [stating rule]; *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman* (1996) 47 Cal.App.4th 777, 784 [letter seeking support of recipients in sender's forthcoming complaint to the Attorney General; protected]; *Ludwig v. Superior Court* (1995) 37 Cal.App.4th 8, 17 [letter asking recipients to contribute to cost of litigation; protected]).

On the other hand, a communication is less likely to be protected activity if it (1) merely presents a demand or claim for payment that is part of the ordinary course of business (*Anapol*, *supra*, 211 Cal.App.4th at p. 827 [insured's initial submission of claim to insurance company as part of "regular course of business" and not in anticipation of litigation; not protected]; *People ex rel. 20th Century Ins. Co. v. Building Permit Consultants, Inc.* (2000) 86 Cal.App.4th 280, 285-286 [same]; *Beach*, *supra*, 110 Cal.App.4th at pp. 94-95 [same]; *Kajima Engineering & Construction, Inc. v. City of Los Angeles* (2002) 95 Cal.App.4th 921, 932 [submission of claim for payment to city; not protected]); (2) constitutes informal negotiation (*Anapol*, at p. 827 [insured's initial submission of claim to insurance company; not protected because "informal negotiations" likely to follow]; *Haneline Pacific Properties, LLC v. May* (2008) 167 Cal.App.4th

10

311, 316, 320 (*Haneline*) ["[n]egotiations and persuasion," even with the "'spect[er] of litigation "loom[ing]"'"; not necessarily protected]), or (3) merely reminds or urges the recipient to adhere to its contractual or legal duties (*Anapol*, at pp. 827-828; *Haneline*, at pp. 316, 320).

## II. Analysis

We independently agree with the trial court's conclusion that Ouriel did not carry his burden of establishing that the Duttons's claims for aiding and abetting fraud and for financial elder abuse arise out of activity protected by the anti-SLAPP statute.

In both of their claims, the Duttons assert that they were injured by the acts of Marinescu, her real estate broker, and Ouriel in making false statements to persuade Wells Fargo to allow Marinescu access to the $427,000 check. Those statements occurred when one or more of them (1) visited the Santa Monica branch of Wells Fargo to persuade the bank to unfreeze the funds, (2) called the Wells Fargo corporate official, and (3) sent the letter explaining why the $427,000 check was legitimate and "respectfully request[ing]" Wells Fargo to "immediately release [the] funds." This is the conduct from which the Duttons's challenged causes of action arise.[4] (*Mission Beverage*, *supra*, 15 Cal.App.5th at p. 698.)

_____

4      Although the Duttons filed an amended complaint after the trial court denied Ouriel's anti-SLAPP motion and although that amended complaint alleges that Marinescu's real estate broker (rather than Ouriel) placed the call to the Wells Fargo corporate official, the amended complaint continues to allege that Ouriel assisted and/or advised Marinescu with respect to the visit, the call, and the letter. We accordingly reject the Duttons's entreaty that we view their filing of an amended complaint as rendering

11

This conduct does not constitute protected activity because the connection between this activity and any anticipated litigation is remote. This conduct was not a precursor to any litigation later initiated by Marinescu, as she never initiated litigation against Wells Fargo (or, for that matter, the Duttons). Nor did this conduct constitute "'communications preparatory to or in anticipation of the bringing of an action or other official proceeding'" as the communications to Wells Fargo did not "relate[] to litigation that [was] contemplated in good faith and under serious consideration." (*Briggs*, *supra*, 19 Cal.4th at p. 1115; *Action Apartment*, *supra*, 41 Cal.4th at p. 1251.) All of the pertinent factors point to this conclusion. Ouriel accompanied Marinescu on the in-person visit; he may or may not have been the person to place the call; and he was at most a ghostwriter of the letter, which was sent by Marinescu's real estate broker on company stationery. Because Ouriel was not at that time licensed to practice law in California or any federal court, he was *incapable* of filing suit in those tribunals on Marinescu's behalf. (Ouriel offered no evidence as to who would be qualified to seek relief for Marinescu before an administrative tribunal.) The conduct in this case was not a necessary prerequisite to any future litigation. Most tellingly, the content of these communications was not related to any anticipated litigation. At no point in the in-person visit, the call, or the letter did Ouriel, Marinescu, or the real estate broker threaten, expressly contemplate, or encourage litigation against Wells Fargo. To the contrary, the communications amounted to a single request that Wells Fargo release the funds: The employees at the branch

---

moot either Ouriel's anti-SLAPP motion to their initial complaint or this appeal challenging the trial court's ruling on that motion.

12

office told Marinescu to contact the corporate office; the corporate office in the call requested a validation of the funds' legitimacy; and the letter responded to that request by purporting to set forth a legitimate reason for the $427,000 deposit and by "respectfully request[ing]" an "immediate[] release [of those] funds." At best, these communications constituted an initial demand or claim for release of funds that was part and parcel of Wells Fargo's regular course of business and thus constituted the first salvo of what might have blossomed into a back-and-forth negotiation between a bank and one of its customers, except that Wells Fargo immediately acquiesced to Marinescu's request. Under well-settled precedent, these communications were not protected activity. (*Anapol*, *supra*, 211 Cal.App.4th at p. 827; *Beach*, *supra*, 110 Cal.App.4th at pp. 94-95; *Haneline*, *supra*, 167 Cal.App.4th at pp. 316, 320.)

Ouriel resists this conclusion with what boils down to two arguments.

First, he asserts that Marinescu retained him for his expertise in "federal banking law," that his bar status still allowed him to initiate administrative proceedings, and that he was Marinescu's "agent," such that the Duttons's lawsuit is "punish[ing]" him for his "successful lawyering." Even if we ignore the absence of any evidence of whether Ouriel met the requirements for representing Marinescu in administrative tribunals, and whether or not Ouriel qualified as Marinescu's agent, the premise of Ouriel's argument is still that his conduct is automatically "protected activity" by virtue of the fact that he was an attorney (in Florida) and provided Marinescu legal advice and assistance. But this premise is invalid because, as noted above, "[n]ot all attorney conduct in connection with litigation, or

13

in the course of representing clients, is protected" activity. (*California Back Specialists*, *supra*, 160 Cal.App.4th at p. 1037.) More is required, and, as explained above, is absent here.

Second, Ouriel contends that *Marinescu* said she was "contemplating bringing an action against Wells Fargo," and that Wells Fargo was concerned Marinescu might "potentially have a claim for breach" of federal banking regulations if they continued to freeze her funds. But the subjective intentions of Marinescu and the worries of Wells Fargo are neither dispositive nor relevant to the question whether *Ouriel* engaged in conduct that was sufficiently in anticipation of litigation as to be deemed protected activity. Ouriel is the one asserting that his conduct was protected activity under the anti-SLAPP statute, so the proper focus is on *Ouriel* and whether his conduct constituted "protected activity" because, while advising Marinescu, he was still exercising "his . . . [own] constitutional right to petition the government" (*Bel Air Internet*, *supra*, 20 Cal.App.5th at p. 944).

\* \* \*

In light of our analysis, we have no occasion to reach the Duttons's many alternative arguments for affirmance (18, by our count) or the second step of the anti-SLAPP analysis.

14

## DISPOSITION

The order is affirmed.  The Duttons are entitled to their costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.

HOFFSTADT


We concur:


_____, P. J.

LUI


_____, J.

CHAVEZ

15