Filed 11/30/20  Termain v. R.E.A Advisors CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| MELVIN TERMAIN et al., | B295498 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BC722291) |
| v. | |
| R.E.A. ADVISORS, INC. et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Barbara A. Meiers, Judge.  Affirmed in part, reversed in part, and remanded.

Alpert, Barr & Grant, Adam D.H. Grant, Alexander S. Kasendorf, and Ryan T. Koczara, for Defendants and Appellants.

Leonard, Dicker & Schreiber, Kevin S. Dicker, for Plaintiffs and Respondents.

We have here an appeal from the denial of a Code of Civil Procedure section 425.16 special motion to strike certain causes of action or allegations in a complaint filed as the result of an acrimonious breakup of a property management business. The key issues we are asked decide are whether certain letters sent to the business's former clients and their insurers are protected communications under Code of Civil Procedure section 425.16,[1] the anti-SLAPP statute, and if so, whether those communications are necessarily covered by the Civil Code's litigation privilege.

## I. BACKGROUND

### A. *Termain Sues Outerbridge After She Threatens Legal Action*

Plaintiff Melvin Termain (Termain) and defendant Sarah Outerbridge (Outerbridge) were the officers of, and fifty-percent shareholders in, defendant R.E.A. Advisors, Inc. (REA), a corporation providing management services to property owners' associations. Termain resigned from REA in late July 2018, and when he did, a number of REA's clients (the Former Clients) terminated their contracts with the company and entered into contracts for management services with 4AIIQ, LLC, a new company Termain had formed. This caused a rift between Termain and Outerbridge.

Termain and 4AIIQ, LLC (collectively, Termain & Co) later filed a verified complaint against Outerbridge and REA (collectively, Outerbridge & Co). An amended complaint (the operative complaint) followed two months later. The operative

---

[1] Undesignated statutory references that follow are to the Code of Civil Procedure.

2

complaint alleges five causes of action: (1) a Corporations Code cause of action by Termain against Outerbridge & Co for involuntary dissolution of REA, (2) an accounting cause of action by Termain against REA, (3) a breach of fiduciary duty cause of action by Termain against Outerbridge, (4) an intentional interference with contract cause of action by 4AIIQ, LLC against Outerbridge & Co, and (5) an intentional interference with prospective economic advantage cause of action by Termain against Outerbridge & Co.  The fourth and fifth intentional interference causes of action are the only ones of interest in this appeal because Outerbridge & Co's anti-SLAPP motion was directed solely at those claims.[2]

The intentional interference causes of action allege Outerbridge & Co were aware of 4AIIQ, LLC and Termain's respective contracts and relationships with the Former Clients. The allegations that comprise the two causes of action also summarize, in substantively identical terms, the acts by Outerbridge that are alleged as a basis for liability.  The operative complaint states Outerbridge "(i) improperly retained over $496,000 of funds belonging to [the Former Clients] as purported 'liquidated damages'; (ii) wrote to the Former Clients' insurance carriers asserting meritless claims for breach of contract; (iii) threatened litigation against the Former Clients for

---

[2]     Termain & Co assert in their Respondents' Brief that 4AIIQ, LLC dismissed its intentional interference cause of action against Outerbridge & Co without prejudice.  No such dismissal appears in the record on appeal, however, and Outerbridge & Co do not address the issue.  Regardless, any dismissal was not before the trial court when it ruled on the anti-SLAPP motion.

the proper exercise of their contractual rights to terminate their relationships with [REA]; and (iv) sought indemnification from the Former Clients."

> **B.** *Outerbridge & Co File a Special Motion to Strike the Intentional Interference Causes of Action, or Certain of Their Allegations*

Outerbridge & Co responded to the operative complaint by filing a special motion to strike the intentional interference causes of action or, in the alternative, at least some of the allegations included in those causes of action. Outerbridge & Co contended each of the four bases summarized as the factual predicate for those causes of action (retaining "liquidated damages," advising insurance carriers of breach of contract, threatening litigation, and seeking indemnification) were activities undertaken in anticipation of litigation, and thus, protected activity under the anti-SLAPP statute. Outerbridge & Co contended Outerbridge decided to sue Termain & Co and the Former Clients in August 2018 (almost immediately after Termain resigned) and Termain & Co had simply beaten them to the punch with their own lawsuit. In addition to arguing the intentional interference acts complained of constituted anti-SLAPP statute protected activity, Outerbridge & Co also argued Termain & Co could not show a probability of prevailing on the intentional interference claims for three reasons: (1) the specified acts were covered by the litigation privilege, (2) Outerbridge & Co had not committed an independently wrongful act, which is necessary to assert an intentional interference with prospective economic advantage claim, and (3) Termain himself suffered no damages.

4

Outerbridge submitted a declaration in support of the anti-SLAPP motion.  In broad strokes, this is what it avers: Outerbridge learned about Termain's resignation and the Former Clients' decisions to terminate their contracts with REA on August 1, 2018.  She contacted and retained attorneys that same day.   After reviewing various REA records and systems, she "began seriously contemplating initiating litigation against [Termain & Co] and the Former Clients" and "then decided that REA would pursue litigation against the Former Clients and [Termain & Co], and began exercising rights REA had under the contracts with the Former Clients."[3]  According to Outerbridge, her "primary reason for contacting attorneys was to evaluate a litigation plan related to Termain's resignation and his and 4AIIQ's actions. . . , the available legal options, and to prepare Litigation Letters [i.e., the letters to the Former Clients and their insurers] . . . ."  A sample of these "Litigation Letters," two that were addressed to Rye Canyon Industrial Center OA (Rye Canyon) and its insurer, are attached to Outerbridge's declaration.

The attached letter addressed to Rye Canyon's insurance carrier states its purpose is to place the insurer on notice for claims of damage arising out of contractual breaches by its insured.  The letter states Rye Canyon was obligated to pay liquidated damages pursuant to its contract with REA and was also required to indemnify, defend, and hold REA and interested parties harmless against any losses and expenses.  The letter additionally states it is intended to "serve as a demand" for

---

[3]     Outerbridge's initial declaration mistakenly refers to Termain and 4AIIQ, LLC as "Defendants."

5

payment of any unpaid liquidated damages and any financial loss incurred, and to tender the defense to any claims arising out of the actions of the insured and its new managing agent." The letter further advises the insurer that "there are multiple avenues of litigation being pursued" and asked the insurer to contact Outerbridge prior to a certain date "to prevent further legal fees."

The attached letter to former client Rye Canyon itself states the client's funds previously held in trust—with deductions for known liabilities, including liquidated damages—were being sent to the client's new managing agent (i.e., Termain & Co). The letter represents its purpose is to notify Rye Canyon that it had breached its contract with REA, the letter claims Rye Canyon had conspired with Termain, and the letter asserts Rye Canyon had been an accomplice to the damage and harm REA had suffered. The letter additionally claims Rye Canyon was required to "indemnify, defend and hold [REA and various affiliated individuals] harmless" from losses, costs, and attorney fees "in connection with your intentional gross misconduct and that misconduct of your new managing agent." The letter closes by notifying Rye Canyon that its insurance company had been provided with a copy of the letter, along with a demand to address REA's damages.

In addition to the sample letters, Outerbridge's declaration attached redacted billing statements from her attorneys. The bills reflect entries as early as August 1, 2018. Though the redactions hide the vast majority of the descriptions of the legal work performed, the non-redacted portion of the bills do indicate, among other things, that the lawyers reviewed emails regarding

6

Termain's actions and reviewed and revised a letter regarding a partnership dispute.

Termain & Co filed an opposition to the anti-SLAPP motion that argued Outerbridge & Co's failure to return the Former Clients' money was illegal because the liquidated damages contractual provision was unenforceable. The opposition also argued Outerbridge & Co had not engaged in protected pre-litigation activity because the letters in question had not been sent in connection with litigation that was contemplated in good faith and under serious consideration. Termain & Co additionally argued that the fourth and fifth intentional interference causes of action had the requisite minimal merit to proceed. Termain & Co asked the court to order Outerbridge & Co to pay attorney fees in the amount of $7,225 for filing a frivolous anti-SLAPP motion.

With their opposition, Termain & Co. submitted declarations from Craig Eichman (Craig), the president of Rye Canyon; Lisa Eichman (Lisa), Rye Canyon's secretary; and Termain himself. According to Craig's declaration, Rye Canyon notified REA that it intended to terminate its contract in late July 2018. The following month, Rye Canyon received a letter from Outerbridge and learned REA was refusing to return $60,000 of the funds REA was holding in trust for Rye Canyon. Craig also learned Rye Canyon's insurance carrier had received a claim stating Rye Canyon owed REA unpaid liquidated damages. Rye Canyon demanded Outerbridge return the $60,000 and she agreed to do so only if Rye Canyon terminated its business relationship with Termain & Co—which Rye Canyon agreed to do. Lisa's declaration was similar to Craig's in substance, including an assertion that Outerbridge refused to return Rye

7

Canyon's $60,000 until Rye Canyon ceased working with Termain & Co. Termain's declaration attested, among other things, that the letters to each of the Former Clients and their insurance carriers were substantially similar. He maintained Outerbridge & Co's actions were a proper basis for civil liability and resulted, in Rye Canyon's case, in the loss of a client and the $18,864 annual fee Rye Canyon paid to 4AIIQ, LLC. Termain also noted Outerbridge & Co had not (at least by the time of the declaration's signing) filed suit against Termain, 4AIIQ, LLC, or any of the Former Clients.

Along with a reply to Termain & Co's opposition, Outerbridge filed her own supplemental declaration. In pertinent part, it reads as follows: "When I sent the letters to the Former Clients and insurers, I did so with a good faith belief that REA had legally viable claims for breach of contract. The communications were sent after I retained counsel and while I was seriously contemplating filing a lawsuit against [Termain & Co] and the Former Clients. In fact, as the Litigation Letters state, multiple avenues of litigation were 'being pursued.' The intent of the Litigation Letters was to (1) provide confirmation of the receipt of termination [of the contracts]; (2) inform the Former Clients that their debts to REA were paid and any remaining funds, after an amount was held for outstanding checks, would be sent to [Termain & Co] with a full accounting; (3) put the Former Clients on notice of their breach of contract and explain why they were in breach; (4) inform the Former Clients that REA was enforcing the terms of the agreement; and (5) demand that the insurance carriers indemnify REA for [Termain & Co's] breaches." Outerbridge acknowledged Termain & Co did sue before REA filed suit, but she maintained REA

would file a cross-complaint against Termain & Co and some of the Former Clients when it was time to answer the complaint.

### C. The Trial Court's Ruling

The trial court heard argument from the parties at a hearing on the anti-SLAPP motion and took the matter under submission. In a subsequent order, the court denied the motion.

The trial court found Outerbridge & Co had not made a prima facie showing that the challenged intentional interference causes of action (or any claims stated in those causes of action) arose from activity protected by the anti-SLAPP statute. Specifically, the court believed Outerbridge's letters were not protected pre-litigation communications—"other than the 1st paragraph," the court said—because there was no basis to believe the statements in the letters were made in connection with litigation contemplated in good faith and under serious consideration and there was "no evidence" a lawyer had approved or suggested the contents of the letter. The trial court also found it significant that there was no evidence of any lawsuit contemplated against the Former Clients to whom Outerbridge sent the letters, there were no justifiable grounds for any such lawsuit in the court's view, and there were no justifiable grounds in the court's view for suits or claims against the Former Clients' insurers. While the court's protected activity determination was alone dispositive, the court further found Termain & Co had in any event shown a probability of prevailing on their intentional interference claims. The trial court granted Termain & Co's request for attorney fees (in the full amount requested), believing the award was "required by the Code."

9

## II.  DISCUSSION

The trial court was wrong to conclude the intentional interference causes of action, or at least the claims premised on the communications sent to the Former Clients and their insurers, did not arise from protected activity.  Outerbridge's declaration, including the sample letters and the attorney fee statements, suffice to make a prima facie showing (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 888 (*Wilson*); *City of Montebello v. Vasquez* (2016) 1 Cal.5th 409, 420 (*Montebello*)) that Outerbridge & Co were contemplating litigation seriously and in good faith.  But a prima facie showing is not a legally dispositive showing, and the difference matters at the second step of anti-SLAPP analysis.  The question of whether litigation was seriously under good faith consideration by Outerbridge & Co— which is the same test for deciding whether the Civil Code's litigation privilege applies to a pre-litigation communication (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1251 (*Action Apartment*))—is a factual issue that cannot be resolved at this stage of the litigation.  Because it is not clear whether the litigation privilege applies, and because the declarations submitted by Termain and the Eichmans (taken as true for present purposes) establish the intentional interference claims have minimal merit, Outerbridge & Co's anti-SLAPP motion fails at the second step of anti-SLAPP analysis.  Though we accordingly affirm the denial of the special motion to strike, we shall reverse the trial court's award of attorney fees to Termain & Co, the non-moving party.  There was no basis for that.

10

*A. The Anti-SLAPP Statute*

The anti-SLAPP statute authorizes a defendant (or cross-defendant) to file a special motion to strike "in order to expedite the early dismissal of unmeritorious claims" arising from protected activity. (*Montebello*, *supra*, 1 Cal.5th at 416, 420.) Our analysis under the anti-SLAPP statute proceeds in two steps.

"First, the moving defendant must make a prima facie showing 'that the act or acts of which the plaintiff complains were taken "in furtherance of the [defendant]'s right of petition or free speech under the United States or California Constitution in connection with a public issue," as defined in the statute.' [Citation.] If the defendant makes this initial showing of protected activity, the burden shifts to the plaintiff at the second step to establish a probability it will prevail on the claim. [Citation.] The plaintiff need only state and substantiate a legally sufficient claim. [Citation.] The plaintiff's evidence is accepted as true; the defendant's evidence is evaluated to determine if it defeats the plaintiff's showing as a matter of law. [Citation.] The procedure is meant to prevent abusive SLAPP suits, while allowing 'claims with the requisite minimal merit [to] proceed.' (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 94[ ].)" (*Montebello*, *supra*, 1 Cal.5th at 420.)

Our review of the trial court's order denying Outerbridge & Co's anti-SLAPP motion is de novo. (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067 (*Park*).)

11

B. *Outerbridge & Co Made a Prima Facie Showing That the Intentional Interference Causes of Action Arise Out of Protected Activity*

A party filing an anti-SLAPP motion satisfies the first prong of the anti-SLAPP statute if he or she makes a prima facie showing that the plaintiff's cause of action "arises from" an act the defendant performed in furtherance of the defendant's right of petition or free speech. (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78 (*Cotati*); see also *Park, supra,* 2 Cal.5th at 1062 ["A claim arises from protected activity when that activity underlies or forms the basis for the claim"].) The moving party does not have to prove that its actions are constitutionally protected as a matter of law. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 319 (*Flatley*).) Rather, "the question is only whether a defendant has made out a prima facie case that activity underlying [the moving party's] claims is statutorily protected." (*Wilson, supra,* 7 Cal.5th at 888.)

There are four categories of "protected activity" under the anti-SLAPP statute. The pertinent category in this case covers "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law." (§ 425.16, subd. (e)(2).) This category of protected activity includes not just statements made during the course of pending litigation, but also certain prelitigation statements—that is, "'communications preparatory to or in anticipation of the bringing of an action. . . .'" (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1115, citations omitted; *Digerati Holdings, LLC v. Young Money*

*Entertainment, LLC* (2011) 194 Cal.App.4th 873, 886-887 (*Digerati*).

A prelitigation statement constitutes protected activity for anti-SLAPP purposes if it "'concern[s] the subject of the dispute' and is made 'in anticipation of litigation "contemplated in good faith and under serious consideration."'" (*Neville v. Chudacoff* (2008) 160 Cal.App.4th 1255, 1268 (*Neville*), quoting *Action Apartment, supra*, 41 Cal.4th at 1251.) The "'good faith [and under] serious consideration' requirement . . . . focuses on whether the litigation was genuinely contemplated . . . . [and] guarantees that hollow threats of litigation are not protected."[4] (*People ex rel. Fire Ins. Exchange v. Anapol* (2012) 211 Cal.App.4th 809, 824 (*Anapol*).) "Thus, for example, when a cause of action arises from conduct that is a 'necessary prerequisite' to litigation, but will lead to litigation only if negotiations fail or contractual commitments are not honored, future litigation is merely theoretical rather than anticipated and the conduct is therefore not protected prelitigation activity." (*Bel Air Internet, LLC v. Morales* (2018) 20 Cal.App.5th 924, 941.)

---

[4]     Contrary to what the trial court believed, the "good faith" requirement does not require a lawyer to have approved or suggested the language used in a prelitigation communication. A lawyer's involvement in the creation or delivery of a communication may of course be probative of whether it was a protected prelitigation communication, but such involvement is not determinative. (See *Anapol, supra*, 211 Cal.App.4th at 830-831 [litigation was not under serious consideration even though the statements at issue were made by attorneys].) If the rule were otherwise, self-represented litigants could not claim the protections of subdivision (e)(2) of the anti-SLAPP statute.

To reiterate, the fourth and fifth intentional interference causes of action arise from the four actions by Outerbridge & Co described therein: (1) retaining over $496,000 of the Former Clients' funds as liquidated damages; (2) sending letters to the Former Clients' insurance companies asserting the clients breached their contracts with REA; (3) threatening litigation against the Former Clients for terminating their relationship with REA; and (4) seeking indemnification from the Former Clients. The evidence in support of Outerbridge & Co's contention that they were seriously and in good faith contemplating litigation when they sent the letters consisted of the letters themselves, redacted attorney fee statements from Outerbridge & Co's attorneys, and the declarations from Outerbridge. (See generally *Cotati*, *supra*, 29 Cal.4th at 79 ["In deciding whether the 'arising from' requirement is met, a court considers 'the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.' (§ 425.16, subd. (b))"].)

Neither the letters nor the attorney fee statements alone make the requisite showing. Focusing first on the letters to the Former Clients, they make various allegations regarding the nature and consequences of the Former Clients' actions, including an assertion they conspired with Termain, but they stop short of expressly mentioning or threatening potential litigation. They do, however, suggest the possibility of litigation in that they assert the Former Clients had a duty to defend and indemnify REA from and against a variety of ills, including claims, attorneys' fees, and damages related to their actions. Considering next the letters to the insurers, they similarly demand a defense against any claims arising out of the actions of

14

the Former Clients and those of their new managing agent (4AIIQ, LLC) and demanded payment of damages. Unlike the client letters, the insurer letters do reference, albeit briefly, "multiple avenues of litigation being pursued, which you [the insurers] will be required to reimburse." As to the attorney fee statements submitted with Outerbridge's declaration, they are heavily redacted but they do indicate Outerbridge communicated with attorneys the same day Termain resigned and the attorneys, at the very least, reviewed emails regarding actions taken by Termain. They also reflect, among other things, that the attorneys considered a settlement offer at the end of August, but they do not identify the other party to the potential settlement.

While the letters and attorney billing statements would not alone be enough to satisfy Outerbridge & Co's step one anti-SLAPP burden, when considered alongside Outerbridge's declarations we believe the threshold prima facie protected activity showing was met. Outerbridge attests she "began seriously contemplating initiating litigation" based on research she began the day she learned Termain resigned from REA and the Former Clients were terminating their relationships with the company. Outerbridge further declares her "primary reason" for contacting attorneys was to "evaluate a litigation plan related to Termain's resignation and his and 4AIIQ's actions . . . ." She avers the letters sent to the Former Clients and their insurers were "part of REA's litigation plan," and while Termain & Co were first to the courthouse, she maintains REA still intended to file a cross-complaint against Termain & Co and some Former

15

Clients when it is time to answer the complaint.[5]  These declaration statements, combined with the other evidence, suffice to make a prima facie showing that the intentional interference claims arose, at least in part, from protected petitioning activity.

The small number of points Termain & Co advance to argue there was no prima facie showing of protected activity are not persuasive.  Termain & Co contend the content of the letters sent by Outerbridge do not sufficiently threaten litigation and were sent for the sole purpose of intimidating and harassing the Former Clients.  This, however, too strongly downplays what the letters do say.  They include one express reference to litigation and they broadly relate to the subject of the dispute between Outerbridge & Co and Termain & Co over the nature of Termain's departure and REA's loss of the Former Clients (as well as a dispute between Outerbridge & Co and the Former Clients regarding the clients' actions).  More importantly, Termain & Co's argument essentially ignores the statements in Outerbridge's declaration.[6]  While Termain & Co may discover

---

[5]     Termain & Co's brief on appeal asserts, without citation to the appellate record, that Outerbridge filed a cross-complaint in November 2019.  Since that fact (if it is a fact) was not before the trial court and is not in the record before us, we do not consider it.

[6]     Termain & Co acknowledge Outerbridge's declaration only briefly, and when they do, they argue that the question of a prima facie showing of protected activity is "at best a disputed issue on which Outerbridge's mere say-so regarding her intent does not meet her SLAPP burden."  The only case cited in connection with this argument is a federal case declining to make a ruling on an anti-SLAPP issue until the plaintiff in the case

grounds to dispute the veracity of her statements as the case unfolds, there is nothing now that wholly negates Outerbridge's factually uncontradicted statement, under penalty of perjury, that she was seriously contemplating litigation against Termain & Co and the Former Clients and the letters were sent as part of Outerbridge & Co's litigation strategy. Nor is there anything now that defeats Outerbridge's assertion, in her supplemental declaration, that REA still intended to file a cross-complaint against Termain & Co and some of the Former Clients.[7]

---

was permitted to conduct discovery, a decision permitted by federal case law and the federal rules of civil procedure. (*Shropshire v. Fred Rappoport Co.* (N.D.Cal. 2003) 294 F.Supp.2d 1085, 1100.) The case has no bearing here.

[7] Termain & Co also argue there has been no prima facie showing that the fourth and fifth causes of action arise at least partly from protected prelitigation communications because the communications do not satisfy the "good faith" portion of the "good faith and under serious consideration" requirement. The substance of Termain & Co's argument, however, relates not to the requirements for anti-SLAPP protection, but to the requirements for the application of the litigation privilege. Although we may look to litigation privilege jurisprudence when considering whether a party has engaged in activity protected by the anti-SLAPP statute, the doctrines are not coextensive, and we need not determine whether a communication is protected by the litigation privilege during a prong-one anti-SLAPP analysis. (See *Navellier*, *supra*, 106 Cal.App.4th at 770 ["privilege informs interpretation of the 'arising from' prong of the anti-SLAPP statute [citation], but protections afforded by the statute and the privilege are not entirely coextensive [citations]"].)

17

### C.    Termain & Co Demonstrated the Intentional Interference Claims Have Minimal Merit

Having concluded Outerbridge & Co clear the prima facie bar for establishing Termain & Co's intentional interference claims arise from protected activity, we move to the second stage of anti-SLAPP analysis.  To defeat the anti-SLAPP motion, Termain & Co bears the burden of demonstrating a probability of prevailing on the challenged claims.  (*Baral v. Schnitt*, 1 Cal.5th 376, 384; see also *Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820.)  In evaluating whether a plaintiff has made that showing, a "court does not weigh evidence or resolve conflicting factual claims.  Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment.  It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law." (*Baral*, *supra*, at 384-385.)  A plaintiff opposing an anti-SLAPP motion thus need only show the cause of action or claim at issue has "minimal merit." (*Baral*, *supra*, at 385, 391; *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 63 [plaintiff need only state and substantiate a legally sufficient claim].)

#### 1.    There is a probability Termain & Co will be able to show the intentional interference claims are not barred by the litigation privilege

Before we assess the factual showing made in support of the viability of the intentional interference claims on the merits, we must decide whether the claims are dead on arrival because they are predicated on prelitigation conduct covered by the

18

litigation privilege codified at Civil Code section 47, subdivision (b).  The litigation privilege "'applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action.  [Citations.]'  [Citation.]"  (*Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 29.)  "The litigation privilege is . . . relevant to the second step in the anti-SLAPP analysis in that it may present a substantive defense a plaintiff must overcome to demonstrate a probability of prevailing."  (*Flatley*, *supra*, 39 Cal.4th at 323.)  The privilege is also "absolute; it applies, if at all, regardless whether the communication was made with malice or the intent to harm.  [Citation.]"  (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 913.)

Like subdivision (e)(2) of section 425.16, which we have already discussed at length, the litigation privilege can apply to prelitigation communications, including demand letters.  (*Lerette v. Dean Witter Organization, Inc.* (1976) 60 Cal.App.3d 573, 577.)  The test as to whether the privilege applies is also nominally the same as the subdivision (e)(2) determination: we consider whether the prelitigation communication in question "relates to litigation that is contemplated in good faith and under serious consideration."  (*Action Apartment*, *supra*, 41 Cal.4th at 1251; see also *ibid*. ["Whether a prelitigation communication relates to litigation that is contemplated in good faith and under serious consideration is an issue of fact.  For example, in [a 1999 case], the Court of Appeal held that the trial court erred in granting summary judgment on the basis of the litigation privilege because '[i]t remain[ed] a triable issue of fact

19

whether . . . imminent litigation was seriously proposed and actually contemplated in good faith as a means of resolving the dispute between [the parties]'"].)

Though the test is the same, the standard of proof at step two of the anti-SLAPP inquiry is reversed. Rather than considering, as we did at step one, whether Outerbridge & Co have made a prima facie showing that the actions challenged as intentional interference with contract or prospective economic advantage arise from communications made in preparation for litigation under serious, good faith consideration, we consider whether Termain & Co have shown the opposite under the low probability of prevailing standard that applies. In other words we determine whether the evidence submitted in connection with the anti-SLAPP motion indicates Termain & Co may be able to prove Outerbridge's letters to the Former Clients and their insurers were *not* sent in furtherance of "'imminent litigation'" that was "'seriously proposed and actually contemplated in good faith as a means of resolving the dispute . . . .'" (*Action Apartment*, *supra*, 41 Cal.4th at 1251.)

Termain & Co has made the required showing and the applicability of the litigation privilege is subject to genuine dispute at this stage. Although Outerbridge declared she was seriously contemplating litigation and had retained counsel prior to writing the letters, there is no good evidence Outerbridge's counsel was in fact preparing to sue at the time. The letters themselves were signed by Outerbridge, not counsel, and the heavily redacted attorney billing statements do not clearly show counsel performed any work in connection with the letters. The letter to the insurers made only an oblique reference to civil litigation, and the letters to the Former Clients made no direct

20

reference to litigation at all. Further, it was Termain & Co, not Outerbridge & Co who sued, and as of the time the anti-SLAPP motion was filed, Outerbridge & Co had neither filed suit against defendant or the Former Clients nor filed a cross-complaint. There is therefore a realistic probability that Termain & Co will be able to show Outerbridge & Co were not seriously considering litigation at the time Outerbridge wrote the letters and the letters were instead attempts to harass the Former Clients, interfere with Termain & Co's relationships with them, or induce a monetary concession without the serious contemplation of actual litigation.

> 2. *The factual predicate for Termain's intentional interference with prospective economic advantage cause of action has the requisite minimal merit*

Apart from the claim that the litigation privilege bars any prospect of prevailing, which we have rejected, Outerbridge & Co maintain Termain & Co have no probability of establishing, factually, the elements of an intentional interference with prospective economic advantage cause of action. The elements of the tort of interference with prospective economic advantage are "(1) an economic relationship between the plaintiff and a third party, with a probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of this relationship; (3) intentional and wrongful conduct on the part of the defendant, designed to interfere with or disrupt the relationship; (4) actual disruption or interference; and (5) economic harm to the plaintiff as a proximate result of the defendant's wrongful conduct. [Citation.] A plaintiff's burden includes pleading and proving

21

'that the defendant not only knowingly interfered with the plaintiff's expectancy, but engaged in conduct that was wrongful by some legal measure other than the fact of interference itself.' [Citation.] We consider an act independently wrongful 'if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard.' [Citation.]" (*Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal.App.4th 688, 713.)

In our view, the declarations submitted with Termain & Co's opposition to the anti-SLAPP motion suffice to meet the minimal merit threshold (*Baral*, *supra*, 1 Cal.5th at 385, 391) for establishing these elements. Termain declares he had a relationship with Rye Canyon, a former client of REA, as well as the Eichmans; the relationship was disrupted by Outerbridge & Co's actions; and Termain & Co suffered monetary harm as a result. Craig Eichman declared REA failed to return $60,000 of funds to Rye Canyon that REA had held in trust for Rye Canyon (an independently wrongful act). Craig's declaration also avers neither he nor anyone else associated with Rye Canyon possessed or duplicated any trade secret or confidential information belonging to REA. Lisa Eichman's declaration made similar assertions. Craig also declared that, had it not been for Outerbridge's actions, there is no reason Rye Canyon would not have stayed in business with Termain & Co.

It makes no difference, as Outerbridge & Co argue, whether the liquidated damages clause in REA's contracts with the Former Clients is presumptively valid. Even if we assume for the sake of argument that the liquidated damages clause was valid, the evidence presented indicates Outerbridge & Co seized money to cover the purported liquidated damages without

22

permission from the Former Clients, without any sort of court order, and without contractual authorization (the pertinent clause of the contract provides the client "shall pay" certain amounts as liquidated damages under specified circumstances but it does not authorize simply seizing such damages from client funds held in trust[8]). This is sufficient to make a prima facie factual showing of an independently wrongful act. We are also unconvinced by Outerbridge & Co's argument that Termain lacks standing to assert an intentional interference with prospective economic advantage claims. The statements in Termain's declaration suffice to show that he personally suffered harm, not just 4AIIQ, LLC.

### D.      Attorney Fees

The anti-SLAPP statute directs a trial court to award reasonable attorneys' fees to a non-moving party when the court determines the defendant's anti-SLAPP motion was "frivolous or . . . solely intended to cause unnecessary delay." (§ 425.16, subd. (c)(1).) "Frivolous in this context means that any reasonable attorney would agree the motion was totally devoid of merit." (*Gerbosi v. Gaims, Weil, West & Epstein, LLP* (2011) 193 Cal.App.4th 435, 450 (*Gerbosi*).)

In order to award attorneys' fees against a losing defendant on an anti-SLAPP motion, "the trial court must make a finding the SLAPP motion was frivolous or brought solely to delay the

---

[8]      This is in contrast to the section of the contract pertaining to the agent's regular compensation, which expressly entitles the agent "to deduct such compensation when due from the funds therein its possession."

proceedings[, and . . . .] must follow the procedural requirements for a sanction order set out in section 128.5 which requires, among other things, the order 'shall recite in detail the conduct or circumstances justifying the order.' . . . Failure to satisfy both these elements renders the order invalid." (*Morin v. Rosenthal* (2004) 122 Cal.App.4th 673, 682 (*Morin*).) We review an order awarding attorneys' fees for abuse of discretion. *(Gerbosi, supra,* 193 Cal.App.4th at 450.)

Here, the trial court's order neither found Outerbridge & Co's motion frivolous nor recited the conduct or circumstances justifying the order; in fact, if anything, the little the trial court's ruling says about the award of fees suggests the trial court erroneously believed Termain & Co were entitled to fees simply because the trial court denied Outerbridge & Co's motion. While this alone requires reversal of the attorney fees award, we are additionally of the view that there was nothing frivolous about Outerbridge & Co's motion and, accordingly, there can be no basis for an award of attorney fees to the non-moving party. We shall accordingly reverse the award of attorney fees.

## DISPOSITION

The trial court's award of attorney fees to Melvin Termain and 4AIIQ, LLC is reversed.  In all other respects, the trial court's order is affirmed.  Both sides are to bear their own costs on appeal.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


BAKER, Acting P. J.

We concur:


MOOR, J.


KIM, J.