Filed 4/8/25  Nobility SD v. Rocher CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| NOBILITY SD, LLC et al.,<br><br>        Plaintiffs and Respondents,<br><br>        v.<br><br>PERFECTE ROCHER,<br><br>        Defendant and Appellant. | D083268<br><br><br>(Super. Ct. No. 37-2023-00002369-CU-DF-CTL) |

APPEAL from an order of the Superior Court of San Diego County, Keri G. Katz, Judge.  Affirmed.

The Vora Law Firm, Anujan Jeevaprakash and Nilay U. Vora, for Defendant and Appellant.

Dunn DeSantis Walt & Kendrick, James A. McFaul and Adam J. Yarbrough and Genevieve Sauter, for Plaintiffs and Respondents.

This case arises out of a struggling venture to open a new restaurant in La Jolla. In the spring of 2022, partners Paul Basile and Jules Wilson invited chef Perfecte Rocher to join them in developing the restaurant by designing the menu, sourcing vendors, and the like. Believing that he would become an equal member of the company that would own the restaurant, Nobility, SD LLC (the LLC), Rocher agreed. By the fall, however, Basile and Wilson became disillusioned with Rocher. When they eventually terminated their working relationship with him, Rocher retained an attorney.

In a series of letters, phone calls, and e-mails over the next few months, Rocher (through counsel) asserted that he remained entitled to his interest in the LLC and other compensation. Basile and Wilson disagreed. After negotiations proved unsuccessful, Basile, Wilson, and the LLC (collectively Nobility) filed a complaint against Rocher asserting causes of action for declaratory relief and slander of title. Rocher responded with a special motion to strike the complaint in its entirety pursuant to the anti-SLAPP statute. (Code Civ. Proc., § 425.16.)[1] He theorizes that both of Nobility's claims were based on his attorney's prelitigation communications, which he maintains are protected by the anti-SLAPP statute.

The trial court denied the special motion to strike and Rocher appeals. For reasons we explain, we independently conclude that Rocher has failed to carry his burden of showing that Nobility's claims arise from protected prelitigation activity and therefore affirm the order denying the motion.

---

[1]    Further undesignated statutory references are to the Code of Civil Procedure. "SLAPP" stands for strategic lawsuit against public participation. (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 882, fn. 2 (*Wilson*).)

## FACTUAL AND PROCEDURAL BACKGROUND

Basile, Wilson, and their longtime friend Anthony Viveros created the LLC in December 2021 for the purpose of opening a restaurant in La Jolla. Rocher is an accomplished chef with experience at renowned restaurants around the world. Beginning in March 2022, Basile and Wilson began discussing the possibility of Rocher joining them in their venture. With the understanding that he would receive an equal interest in the LLC, Rocher agreed.

In April 2022, Rocher accepted an Executive Chef position with the LLC. The employment offer letter described "Pre-Opening Expectations" for Rocher, which included such tasks as creating the menu, sourcing vendors, and designing the kitchen. The letter also outlined Rocher's overall compensation, which included a salary, benefits, a "3 [percent] from Gross" management fee, and a "[percentage] of equity" in the LLC "to be equal as other founders." Rocher expected his membership interest in the LLC to be formalized in an updated operating agreement sometime soon.

Rocher began working on the restaurant right away. In his view, things started off smoothly. After a few months, however, tensions arose between the four collaborators. Basile and Wilson became particularly concerned about the "toxic" working relationship between Rocher and Viveros. Although Rocher assured Basile and Wilson that he wanted to continue working with Viveros, Viveros did not feel the same way, so Basile and Wilson purchased Viveros's share of the company in July 2022. Since Viveros was primarily responsible for providing capital and finding investors for the restaurant, the venture experienced financial setbacks.

Meanwhile, Rocher had been asking Basile and Wilson whether the operating agreement had been updated to reflect his membership interest in

3

the LLC. Basile repeatedly assured Rocher that a revised agreement was forthcoming. Finally, in September 2022, Basile sent Rocher a draft of a revised agreement granting Rocher a restricted membership interest that would not vest until certain financial conditions were satisfied.

Before the operating agreement was finalized or executed, Basile and Wilson's relationship with Rocher broke down. According to Basile, Rocher was unproductive, and the few ideas he came up with were unworkable and too expensive. They had drastically different visions for the restaurant. Basile and Wilson became "overwhelmed" with the lack of progress and the "significant lack of capital." They stopped paying Rocher on time and then terminated him in late October 2022.

At this point, Rocher retained attorney Chet H. Olsen to pursue claims for wrongful termination and breach of contract. On October 27, 2022, Olsen sent Basile and Wilson a letter that stated in critical part:

> "We have reviewed agreements and documentation pertaining to the relationship among [Rocher], the LLC and its other owners. This documentation includes emails . . . stat[ing] that Perfecte Rocher has no 'rights relative to Nobility SD, LLC' and that 'any pending offers' relating to the LLC are terminated. Such unilateral proclamations do not, however, end the relationship, the LLC's obligations or our client's right to ownership and compensation.
>
> "Perfecte Rocher made substantial contributions to the LLC. . . . As consideration for [his] contributions to the LLC and its business, Perfecte was given a management fee based on sales, an annual distribution and 'equity to be equal as other founders.' This consideration was not a 'pending offer' as you reference in your emails, but rather it was the consideration included in the [offer letter] binding the LLC. [¶] . . . [¶]"

4

"While an operating agreement was never finalized or signed by any of the LLC members, this is not a requirement for our client's membership interest in the LLC to legally exist. His membership interest was based not only on the actions of you and the other members of the LLC, but the inclusion of Perfecte as a founder of the LLC and its business. [He] relied on promises made by you and the LLC in emails, agreements, documents, and verbal communications. . . .

"Mr. Basile, other members of the LLC and the LLC itself have no legal standing or authority to exclude an owner of the LLC and founder of its business. Taking another owner's contributions to the LLC and its business and then excluding that owner from the proceeds of such effort is not only contrary to normal business practices but also a breach of contract and violation of the California Corporations Code. Perfecte Rocher maintains his one-third ownership in the LLC and continues to be entitled to three percent of the gross sales of the restaurant.

"We fully expect you and the other LLC members to comply with its legal obligations as outlined above. We look forward to your assurances that this will be the case. I suggest you or your legal counsel contact me immediately to discuss properly addressing Mr. Rocher's membership interest in the LLC and his compensation pursuant to his contract with the LLC. . . . [¶] . . . This letter is not intended to be a complete statement of our client's rights and shall not be construed as a waiver of any legal or equitable rights or remedies, all of which are expressly reserved."

In early November 2023, Olsen connected with counsel for Basile and Wilson, James A. McFaul. In an initial phone call between counsel, McFaul explained his clients' position and asked that Rocher retract his claim to having an interest in the LLC. According to McFaul, "[t]he prospect of litigation was not discussed during this call." In another call two weeks later,

Olsen informed McFaul that Rocher would not retract his claim and made a "settlement demand" for $250,000.

Later that same month, McFaul wrote a letter to Olsen formally responding to the October letter and rejecting the $250,000 settlement demand. As McFaul explained in the letter, Basile and Wilson took the position that Rocher would only become entitled to the management fee and the interest in the LLC upon completing his Pre-Opening Expectations, which he failed to do. They asserted that Rocher was unproductive and had a "combative attitude" that "drove away talent" such as Viveros. This put the restaurant project months behind schedule and lacking in investors. After five months of working with Rocher, Basile and Wilson felt they had no choice but to remove him from the project and start over from the beginning.

The letter made clear that Rocher's assertion that he holds an interest in the LLC "cannot – and will not – be allowed to sit idle while [the company] continues to pursue the opening of a restaurant." Basile and Wilson gave Rocher two choices: (1) in exchange for Rocher affirming he holds no interest in the LLC and a mutual release of claims, they would assign him the rights to his ideas for the restaurant (e.g., a name and an associated website domain); or (2) Rocher could purchase their interests in the LLC. If Rocher was not amenable to either of those choices, Basile and Wilson would "pursue an immediate action for, at the very least, a declaration" that Rocher had no interest in the company.

Counsel continued to discuss their clients' settlement positions via e-mail and phone over the next several weeks. On January 4, 2023, Olsen sent an e-mail to McFaul that stated in part:

6

"During our call, I indicated that [Rocher was] not interested in what your client[s] . . . proposed and I urged you to get back a dollar figure response to the $250,000 offer. Based on what you told me, I was expecting to hear back from you with a number. Without such a counteroffer . . . , you are asking my client[ ] to negotiate against [himself] by lowering [his] own offer. [He is] unwilling to do this. It remains [Rocher's] position that contributions were made to the business that were used by the LLC and its other owners. The position that ownership rights exist also remains. [¶] I hope you can now follow up with your client[s] and a counteroffer is presented. Otherwise, we will need to discuss other ways to address this situation."

In an e-mailed response, McFaul maintained that Basile and Wilson would not make any monetary offer. He reiterated that Rocher's "continued assertion" that he holds an interest in the LLC was "baseless," inhibited the company from acquiring new investors—"because who wants to invest in a company where the ownership is being disputed?"—and in turn delayed the project. McFaul again urged Rocher to "expressly withdraw his assertion of any ownership interest in the company" or else "the damages associated with [his] slander of title will only continue." The record does not reflect any reply from Olsen.

Basile, Wilson, and the LLC (collectively Nobility) sued Rocher on January 18, 2023, asserting causes of action for declaratory relief and slander of title. The complaint generally alleged that, soon after Rocher was terminated, he "for the first time falsely claimed – and has since continued to falsely claim – that he is a member of [the LLC]."

In their first cause of action for declaratory relief, Nobility further alleged: "An actual controversy has developed and presently exists between [Nobility] and Rocher concerning whether (or not) Rocher is a member of [the LLC]. [Nobility] assert[s] that Rocher is not a member of [the LLC].

7

Rocher asserts – falsely and without any legal or factual basis upon which to tether such an assertion – that he is a member of [the LLC]. And Rocher refuses to recant such assertion." Nobility sought a judgment declaring that Rocher was not a member of the company.

In their second cause of action for slander of title, Nobility alleged that "Rocher asserts that he is an owner of a membership interest in [the LLC], casting doubt on the existing members of [the LLC], as well as the ownership interests Basile and Wilson hold in [the LLC]." Nobility explained that they were "compelled to reproduce Rocher's false statement to investors" and that "Rocher knows or should know that [they] are obligated" to make such disclosures. They claimed to suffer financial harm in the form of project delays and legal expenses.

In the course of discovery, Rocher asked Nobility to "[d]escribe in detail each and every time Rocher has claimed that he is a member of [the LLC] as alleged in" the complaint. (Some capitalization omitted.) In response, Nobility identified: (1) the October 27, 2022 letter from Olsen; (2) subsequent phone calls between Olsen and Nobility's counsel; and (3) the January 4, 2023 e-mail from Olsen.

After receiving these discovery responses, Rocher filed an anti-SLAPP motion to strike the complaint in its entirety. He contended that both causes of action were solely based upon communications from Olsen to McFaul. Rocher characterized these as "prelitigation and settlement communications" made in good faith and in serious contemplation of filing his own lawsuit

8

against Nobility.[2] Accordingly, Olsen's communications were statements made "before" a judicial proceeding or "in connection with an issue under consideration or review" by a judicial body, qualifying for anti-SLAPP protection. (§ 425.16, subd. (e)(1) & (2).)[3] Rocher further contended that, because Olsen's communications were made in good faith and in serious contemplation of litigation, they were protected by the litigation privilege (Civ. Code, § 47, subd. (b)) and therefore could not be used to support Nobility's claims. And since both causes of action were based entirely on those communications, Rocher maintained that Nobility could not demonstrate a probability of success on the merits.

In opposition, Nobility focused on the October letter. They argued their claims did not arise from the letter itself, but rather from Rocher's asserted interest in the LLC. The fact that Olsen communicated this position in writing did not "make the subject matter of the dispute 'protected' or 'privileged' in any fashion." In their view, this was essentially a property dispute and Olsen's letter merely evidenced that dispute. Even assuming

---

[2] One month after filing his anti-SLAPP motion, Rocher (and his wife, who provided certain services for the LLC after Viveros's departure) filed a complaint against Nobility asserting more than a dozen causes of action, including claims sounding in fraud, breach of contract, and wrongful termination, as well as Labor Code violations.

[3] Rocher also suggested, to the extent that "wrongs committed by [Nobility] against business partners and employees would be of interest to those who wished to patronize or work at" the restaurant, Olsen's statements furthered his right of petition " 'in connection with a public issue or an issue of public interest' " within the meaning of section 425.16, subdivision (e)(4). He does not renew that argument on appeal. To the extent he mentions section 425.16, subdivision (e)(4) in his reply brief, we consider the argument untimely and undeveloped. (See *People v. Rangel* (2016) 62 Cal.4th 1192, 1218 (*Rangel*) [" 'Obvious reasons of fairness militate against consideration of an issue raised initially in the reply brief' "].)

9

their claims arose from the letter itself, Nobility argued that anti-SLAPP protection did not apply because the letter did not mention, let alone threaten or propose, litigation. In supporting declarations, Basile affirmed that Nobility did not understand the letter to be proposing or threatening litigation, and McFaul stated that Rocher's litigation counsel "commented to [him] that it was likely that Rocher would have simply gone his separate way had [Nobility] not initiated this action." For these same reasons, Nobility argued that Rocher was *not* entitled to claim the litigation privilege and their causes of action were otherwise meritorious.

Rocher maintained on reply that Nobility's causes of action were necessarily based on Olsen's communications because he has not asserted a membership interest in the LLC in any other context. And even though the October letter and the January e-mail did not use the word "litigation," the only reasonable inference to be drawn from the language these communications *did* use—such as seeking "assurances" that the LLC will "comply with its legal obligations," requesting an "immediate" response from counsel, and proposing to discuss "other ways to address this situation" if Nobility did not provide a counteroffer—is that litigation was imminent. As to the merits, he reiterated that the litigation privilege applied, and pointed out that Nobility failed to produce admissible evidence of damages to support their slander of title claim.

Following a hearing, the trial court denied the anti-SLAPP motion. As an initial matter, it found that Nobility's claims were based on the October letter and the January e-mail. It rejected Nobility's suggestion to disregard any communications following the October letter, as the complaint alleged that soon after Rocher was terminated, he "for the first time falsely claimed – *and has since continued to falsely claim* – that he is a member of [the LLC]."

10

(Italics added.) But the court declined to analyze the phone calls that took place between the letter and the e-mail, as Rocher provided inadequate evidence "as to the content and context" of the calls to determine whether they contained protected statements.

The court then found that neither the October letter nor the January e-mail related to litigation that was contemplated in good faith and under serious consideration, as necessary to merit protection under section 425.16, subdivision (e)(1) or (2). As to the letter, the court saw no threat or mention of litigation. The references to a "breach of contract" and a "violation of the California Corporations Code," the reservation of rights, and the other phrases that Rocher highlighted in the letter did not, without more, evidence a contemplated litigation. The court also noted that Rocher did not file his own suit against Nobility until six months after the letter.

As to the e-mail, the court again detected no mention or threat of litigation. The references to settlement discussions and "other ways to address this situation" were, in the court's view, "insufficient to convey the requisite intent to pursue litigation." On this point, the trial court found support in *Nirschl v. Schiller* (2023) 91 Cal.App.5th 386 (*Nirschl*), where the appellate court observed that " 'statements made in a pre-litigation negotiation are not automatically protected under the anti-SLAPP law just because they relate to 'settlement.' " (*Id*. at p. 404.)

Having decided that Rocher failed to demonstrate that Nobility's complaint arose from protected activity, it declined to reach the further issue whether Nobility had established minimal merit to their claims.

## DISCUSSION

Rocher contends the trial court erred in denying his motion to strike the complaint. He maintains that both of Nobility's claims were based on

11

Olsen's communications collectively. Apparently inspired by an earlier decision of this court—*RGC Gaslamp, LLC v. Ehmcke Sheet Metal Co., Inc.,* (2020) 56 Cal.App.5th 413 (*RGC Gaslamp*)—Rocher presents a slightly different theory on appeal as to why these communications are protected by the anti-SLAPP statute. In the trial court, he asserted these communications were made in good faith while seriously contemplating filing his own lawsuit, which is the test the trial court applied. On appeal, he suggests this was the incorrect standard. He now seeks to characterize Olsen's October correspondence as a "demand letter" which, in his view, means that the letter itself and the subsequent communications are categorically protected.[4]

For reasons we explain, we reject Rocher's reframing, which is premised on a misapplication of *RGC Gaslamp*. We otherwise agree with the trial court that Rocher failed to demonstrate that Nobility's claims arise from protected prelitigation activity. We therefore do not reach the question whether Nobility established minimal merit to their claims, and affirm the denial of the motion.

## A. *Anti-SLAPP Motions Generally*

"[T]he anti-SLAPP statute is designed to protect defendants from meritless lawsuits that might chill the exercise of their rights to speak and petition on matters of public concern. [Citations.] To that end, the statute authorizes a special motion to strike a claim 'arising from any act of that

---

[4] We recognize the general rule that new theories not raised in the trial court will not be considered for the first time on appeal. (*Hewlett-Packard Co. v. Oracle Corp. (*2021) 65 Cal.App.5th 506, 548.) Of course, the line between a "new theory" and a "revised" or "enhanced" one is not always clear, and here Nobility does not appear to assert that this modification of Rocher's theory should not be considered. In any event, we would exercise our discretion to consider the merits of Rocher's overall argument.

person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue.' " (*Wilson, supra,* 7 Cal.5th at pp. 883–884; see § 425.16.)

"Anti-SLAPP motions are evaluated through a two-step process. Initially, the moving defendant bears the burden of establishing that the challenged allegations or claims "aris[e] from" protected activity in which the defendant has engaged." (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1061 (*Park*), quoting § 425.16, subd. (b).) "[T]he Legislature has defined such protected acts in furtherance of speech and petition rights to include a specified range of statements, writings, and conduct in connection with official proceedings and matters of public interest." (*Park,* at p. 1062; see § 425.16, subd. (e).) As relevant here, the anti-SLAPP statute protects any written or oral statement made "before" a judicial proceeding or "in connection with an issue under consideration or review" by a judicial body. (*Id.,* subd. (e)(1) & (2).) "If the defendant carries its burden, the plaintiff must then demonstrate its claims have at least 'minimal merit.' " (*Park,* at p. 1061.) The Supreme Court has described "this second step as a 'summary-judgment-like procedure.' " (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384.) "If the plaintiff cannot make this showing, the court will strike the claim." (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1009.) "The anti-SLAPP statute does not insulate defendants from *any* liability for claims arising from the protected rights of petition or speech. It only provides a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity." (*Baral,* at p. 384.)

"We review de novo the grant or denial of an anti-SLAPP motion. We exercise independent judgment in determining whether, based on our own review of the record, the challenged claims arise from protected activity.

13

In addition to the pleadings, we may consider affidavits concerning the facts upon which liability is based. We do not, however, weigh the evidence, but accept plaintiff's submissions as true and consider only whether any contrary evidence from the defendant establishes its entitlement to prevail as a matter of law." (*Park, supra*, 2 Cal.5th at p. 1067, citations omitted.)

## B.     *Declaratory Relief*

On appeal, Nobility does not dispute that both of its claims arise from Olsen's communications. In our independent judgment, however, the declaratory relief claim is based on *the dispute* between the parties as to whether Rocher holds an interest in the LLC. Olsen's communications merely evidence Rocher's position in that dispute. Because Rocher does not argue that simply taking a position in a dispute can constitute protected activity, he has not carried his burden with respect to that claim.

"A claim arises from protected activity when that activity underlies or forms the basis for the claim." (*Park, supra*, 2 Cal.5th at p. 1062.) "[A] claim is not subject to a motion to strike simply because it contests an action or decision that was arrived at following speech or petitioning activity, or that was thereafter communicated by means of speech or petitioning activity. Rather, a claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted." (*Id*. at p. 1060.) Thus, "in ruling on an anti-SLAPP motion, courts should consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability." (*Id*. at p. 1063.)

To qualify for declaratory relief, Nobility must demonstrate "two essential elements: '(1) a proper subject of declaratory relief, and (2) an actual controversy involving justiciable questions relating to [Nobility's]

14

rights or obligations.' " (*Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1582; see § 1060.)[5] "A controversy regarding the status of one claiming membership in a corporation is a proper subject of a declaratory judgment." (*Maguire v. Hibernia Savings & Loan* (1944) 23 Cal.2d 719, 731.) " 'The "actual controversy" language in . . . section 1060 encompasses a *probable* future controversy relating to the legal rights and duties of the parties.' It does not embrace controversies that are 'conjectural, anticipated to occur in the future, or an attempt to obtain an advisory opinion from the court.' Thus, while a party may seek declaratory judgment before an actual invasion of rights has occurred, it must still demonstrate that the controversy is justiciable. And to be justiciable, the controversy must be ripe." (*Wilson & Wilson*, at p. 1582, citations omitted.) " 'A controversy is "ripe" when it has reached, but has not passed, the point that the facts have sufficiently congealed to permit an intelligent and useful decision to be made.' " (*Id*. at p. 1573.)

Other cases involving anti-SLAPP motions to strike declaratory relief claims are instructive here. In *City of Cotati v. Cashman* (2002) 29 Cal.4th

---

[5] At oral argument, Rocher's counsel stated that the declaratory relief issue was "effectively moot" because Rocher no longer claims "that he owns any piece of the LLC." We suspect that counsel was referencing a contention raised in the reply brief. Specifically, in arguing they could prevail on their declaratory relief claim, Nobility pointed out that Rocher had admitted in a declaration that "Mr. Basile and Ms. Wilson never fulfilled their promise of finalizing my membership in [the LLC]." In response, Rocher asserted that because he conceded he was not a current member, there was no actual controversy, and therefore Nobility could *not* prevail on their claim. At the same time, Rocher plainly requests this court to order the trial court to dismiss Nobility's entire complaint. Accordingly, we will not construe counsel's remarks at oral argument as an abandonment of his contention that the trial court erred in denying his motion to strike the declaratory relief claim.

69 (*Cotati*), the city adopted a mobilehome park rent control program. (*Id.* at p. 72.) Several owners of mobilehome parks sued the city in federal court seeking declaratory relief, among other remedies. (*Ibid.*) In turn, the city sued the owners in state court, similarly asserting a declaratory relief claim. (*Ibid.*) The city alleged that " '[a]n actual controversy has arisen and now exists between" the city and the owners " 'in that [the city] contends that the [mobilehome park rent stabilization] ordinance and resolution are valid and enforceable' " whereas the owners " 'contend that said ordinance, on its face is unenforceable, invalid, and void as effecting an unconstitutional taking . . . ." (*Ibid.*) The owners filed an anti-SLAPP motion to strike the city's complaint, arguing the city's action arose from the owners filing their federal action, which constituted protected petitioning activity. (*Id.* at pp. 72–73.)

The Supreme Court disagreed. It determined that the actual controversy underlying the city's action (as well as the owners' federal action) was the constitutionality of the rent control ordinance. (*Cotati, supra*, 29 Cal.4th at pp. 74, 79–80.) Although the owners' federal action informed the city of the existence of an actual controversy justifying declaratory relief, and therefore may have prompted the city to file its action, this does not mean the city's declaratory relief claim arose from the federal action. (*Id.* at pp. 74, 77–80.) The court thus concluded that the owners failed to meet their burden of demonstrating the city's claim arose from protected activity. (*Id.* at p. 76.)

Similarly, in *City of Alhambra v. D'Ausilio* (2011) 193 Cal.App.4th 1301 (*Alhambra*), D'Ausilio sued the city for civil rights violations and the parties settled. (*Id.* at p. 1303.) The settlement agreement included a provision (Section 3.8) that prohibited D'Ausilio from representing, participating, or advocating for city employees in any matter involving the city for a period of time. (*Id.* at p. 1304.) One year later, D'Ausilio encouraged members of a

16

local firefighter's organization to join a planned demonstration against the city, and participated in a protest by city employees against the city. (*Ibid.*) The city sued D'Ausilio for declaratory relief, among other claims, alleging "that an 'actual controversy has arisen and now exists' between the parties 'concerning their respective rights and duties' under Section 3.8." (*Ibid.*) It sought a judicial determination of the validity of Section 3.8 and whether D'Ausilio violated that provision. (*Id.* at pp. 1304–1305.) D'Ausilio filed an anti-SLAPP motion to strike the declaratory relief claim. (*Id.* at p. 1305.)

In *Alhambra, supra,* 193 Cal.App.4th 1301, it was undisputed that D'Ausilio's alleged activities involving demonstrations against the city qualified as protected activity under the anti-SLAPP statute. (*Id.* at p. 1307.) It was also undisputed that his activities triggered the city's lawsuit. (*Ibid.*) The Court of Appeal determined, however, that the declaratory relief claim did not arise from those protected activities "but from an actual, present controversy between the parties regarding the scope and enforceability of Section 3.8 of the settlement agreement." (*Id.* at p. 1307.) The appellate court elaborated: "While [D'Ausilio's] protected speech activities may have alerted the City that an actual controversy existed regarding the legality of Section 3.8, the speech itself does not constitute the controversy. The City did not sue [D'Ausilio] because he engaged in protected speech; the City sued him because it believed he breached a contract which prevented him from engaging in certain speech-related conduct and a dispute exists as to the scope and validity of that contract." (*Id.* at p. 1308.)

Applying the logic of *Cotati* and *Alhambra* here, we reach the same conclusion. The actual controversy underlying Nobility's declaratory relief action is whether Rocher holds a membership interest in the LLC. Indeed, Nobility alleges that "[a]n actual controversy has developed and presently

17

exists between [them] and Rocher *concerning whether (or not) Rocher is a member of [the LLC].*  [Nobility] assert[s] that Rocher is not a member of [the LLC].  Rocher asserts . . . that he is a member of [the LLC].  And Rocher refuses to recant such assertion."  (Italics added.)  Olsen's letter and subsequent communications may have apprised Nobility of Rocher's position—that he was entitled to an interest despite his termination—and apparently prompted Nobility to file suit.  But this does not mean its declaratory relief claim arises from Olsen's communications.  In other words, Olsen's communications "may supply evidence of" the fact that Rocher has taken a position adverse to Nobility "but that does not convert the statements themselves into the basis for liability."  (*Park*, *supra*, 2 Cal.5th at p. 1068.)

Because Rocher does not argue that merely taking a position on whether he is entitled to an interest in the company is, itself, protected activity (nor can we conceive of such an argument), we must conclude that he has failed to carry his burden of demonstrating that Nobility's declaratory relief action arose from protected activity under the anti-SLAPP statute.

## C.     *Slander of Title*

Unlike the declaratory relief  claim, we can accept the premise that Nobility's slander of title claim is predicated on Rocher's *expression* (through Olsen) of his position that he holds an interest in the LLC, since slander of title requires proof of publication.  (See *Truck Ins. Exchange v. Bennett* (1997) 53 Cal.App.4th 75, 84 ["Disparagement of title occurs when a person, without a privilege to do so, *publishes a false statement* that disparages title to property and causes pecuniary loss" (italics added)].)  Even accepting that premise, we nevertheless conclude that Rocher has failed to make a prima facie showing that his assertions are protected prelitigation communications.

18

As discussed above, the anti-SLAPP statute protects any written or oral statement made "before" a judicial proceeding or "in connection with an issue under consideration or review" by a judicial body.  (§ 425.16, subd. (e)(1) & (2).)  "Although the statutory language refers to litigation then pending, it has been interpreted to apply to prelitigation statements.  Communications preparatory to, or in anticipation of, bringing an action are within the protection of the anti-SLAPP statute."  (*People ex rel. Fire Ins. Exchange v. Anapol* (2012) 211 Cal.App.4th 809, 824 (*Anapol*), citation omitted.)

"But courts have also recognized that expanding anti-SLAPP protection to any statement that involves potential litigation reaches too far," as "[a]lmost any dispute could potentially lead to – and so could be argued to be in 'anticipation' of – litigation."  (*Nirschl*, *supra*, 91 Cal.App.5th at p. 401.)  "Protection of prelitigation statements 'only arises at the point in time when litigation is no longer a mere possibility, but has instead ripened into a *proposed proceeding* that is actually contemplated in good faith and under serious consideration as a means of obtaining access to the courts for the purpose of resolving the dispute.' "[6]  (*Nirschl*, at p. 401)  The " ' "in good faith and under serious consideration" ' " criteria can be helpful in finding the line between protected and unprotected prelitigation communications (*id*. at p. 401, fn. 7), particularly in cases where the relevant statements "do not

---

[6]     The "in good faith and under serious contemplation" criteria are borrowed from the caselaw construing the litigation privilege set forth in Civil Code section 47, subdivision (b).  Our courts have "looked to the litigation privilege as an aid in construing the scope of section 425.16, subdivision (e)(1) and (2) with respect to the first step of the two-step anti-SLAPP inquiry . . . ."  (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 323 (*Flatley*).) These are, however, "substantively different statutes that serve quite different purposes" and are not completely coextensive in scope.  (*Id*. at pp. 322–323.)

intrinsically anticipate litigation." (*RGC Gaslamp, supra,* 56 Cal.App.5th at p. 429; see also *id.* at pp. 429–431 [discussing examples of communications that intrinsically anticipate litigation].)

As we understand it, Rocher's principal argument on appeal is that Olsen sent what amounted to a demand letter intrinsically anticipating litigation such that the good-faith-and-serious-contemplation test should not apply. We do not doubt that a true demand letter often or typically qualifies as protected conduct. (See, e.g., *Malin v. Singer* (2013) 217 Cal.App.4th 1283, 1293 (*Malin*) ["Ordinarily, a demand letter sent in anticipation of litigation is a legitimate speech or petitioning activity that is protected under section 425.16"]; but see, e.g., *Flatley, supra,* 39 Cal.4th at p. 305 [anti-SLAPP statute does not protect a demand letter that constitutes criminal extortion].) But we do not agree that Olsen's communications, taken separately or together, amount to a demand letter that intrinsically anticipates litigation.

The demand letters in the cases that Rocher relies on explicitly threaten imminent litigation. For instance, in *Malin, supra,* 217 Cal.App.4th 1283, the defendant's attorney sent the plaintiff a demand letter stating that "my client intends to file the enclosed lawsuit against you" unless the dispute was resolved to her satisfaction within five days and attached a copy of the proposed complaint. (*Id.* at pp. 1288–1289.) Upon deciding that the demand letter did not amount to criminal extortion as a matter of law, the Court of Appeal easily concluded that the demand letter was protected under the anti-SLAPP statute. (*Id.* at pp. 1294, 1300.)

Similarly, in *Blanchard v. DIRECTV, Inc.* (2004) 123 Cal.App.4th 903 (*Blanchard*), defendant DIRECTV sent demand letters to individuals believed to possess devices used to steal its programming. (*Id.* at pp. 910–911.) An initial round of demand letters threatened to "initiate legal

20

proceedings" and "abandon its attempts to negotiate" if the recipients did not satisfy a list of demands. (*Id.* at p. 910.) Another round of letters "stated that, unless the recipient contacted the sender within days, a lawsuit would be filed based on a draft complaint that was enclosed with the letter." (*Id.* at p. 911.) The plaintiffs effectively conceded that these demand letters were statements in furtherance of the right to petition. (*Id.* at pp. 911–912, 918.)

Unlike *Malin* and *Blanchard*, Olsen never sent a proposed complaint or otherwise threatened to initiate litigation unless Nobility satisfied certain demands. In the October letter, Olsen explained that Rocher retained his one-third interest in the LLC and his three-percent management fee— notwithstanding his termination and despite the fact that a revised operating agreement was never finalized—based on his "substantial contributions" to the project, his signed employment offer letter, and other promises made by Basile and Wilson. Olsen did reference a "breach of contract and a violation of the California Corporations Code"—not in describing legal claims that Rocher would bring against Nobility in court, but in the context of explaining why Nobility had no legal basis to deny Rocher his interests. Olsen and Rocher "fully expect[ed]" Nobility "to comply with [their] legal obligations as outlined," "look[ed] forward to [their] assurances that this will be the case," and simply "suggest[ed]" that Nobility or their counsel contact Olsen to discuss matters further. Nowhere in this letter did Olsen threaten or propose to file suit if Nobility refused to recognize Rocher's interests in the LLC and the restaurant.

Based on the responding letter from McFaul, as well as his declaration supporting Nobility's opposition to the anti-SLAPP motion, we know that Olsen subsequently made a "settlement demand" for $250,000 over the phone. We have no evidence, however, that Olsen demanded that Nobility

21

pay this amount or else Rocher would file suit. Rocher did not submit a declaration from Olsen to support his anti-SLAPP motion, and his own declaration does not speak to the monetary demand. It is entirely possible that Olsen gave Nobility two choices that did not involve litigation: either honor Rocher's interests or pay him $250,000.

Nobility refused to pay Rocher $250,000, offering instead two "practical paths" forward: (1) Rocher could receive the rights to his restaurant ideas in exchange for affirming that he holds no interest in the LLC and a mutual release of claims; or (2) he could purchase Basile and Wilson's interests in the LLC. McFaul specified in his November letter to Olsen that, if Rocher did not accept either of those two options, Nobility would "be forced to pursue an immediate action for, at the very least, a declaration that [he] holds zero membership interest in" the LLC.[7]

Even at this point, when Nobility raised the possibility of filing suit, Rocher did not respond in kind. Instead, he continued to pursue ways to settle the dispute. In Olsen's January e-mail to McFaul, he clarified that Rocher was not interested in Nobility's proposal. He expected Nobility to come up with "a dollar figure response to the $250,000 offer." Olsen concluded the e-mail: "I hope you can now follow up with your client and a counteroffer is presented. Otherwise, we will need to discuss other ways to

_____

[7] Rocher does not argue in his opening brief that Nobility's threat of litigation brought Olsen's subsequent communications within the scope of the anti-SLAPP statute. To the extent he touches on this argument in his reply brief, we again consider the issue untimely and undeveloped. (See *Rangel, supra*, 62 Cal.4th at p. 1218.) We therefore do not analyze the communications in this light.

address this situation." The vague reference to "other ways to address this situation" cannot fairly be construed as an unequivocal threat of litigation.[8]

In our view, these communications do not clearly and/or intrinsically anticipate litigation like the demand letters in *Milan* and *Blanchard*. They are more ambiguous, such that the "in good faith and under serious consideration" criteria and caselaw are useful here. Applying those criteria, we independently reach the same conclusion as the trial court: Rocher has failed to make a prima facie showing that Olsen's communications crossed the line from unprotected to protected conduct.

Of course, engaging an attorney to send a letter can often be a step toward litigation. But not every communication from an attorney is protected under the anti-SLAPP statute; the question remains whether litigation has become more than a mere possibility. Here, Olsen's October letter is most reasonably read as a request for Nobility to comply with its contractual obligations, as Rocher understood them. In the letter, Olsen tells Nobility that their "unilateral proclamations"—terminating the " 'working relationship' " with Rocher and asserting that he has no rights with the LLC—did not, in fact, "end the relationship, the LLC's obligations or [Rocher's] right to ownership and compensation." As discussed, the letter goes on to explain why Rocher remained entitled to his interests in the LLC and the management fee, and why Nobility had no grounds to deny him those interests. The letter ends with a request for "assurances" that Nobility will "comply with its legal obligations as outlined above."

---

8     Rocher points out that "Mediation privileged" is written at the top of McFaul's e-mail immediately preceding Olsen's January e-mail. We are not convinced that this one errant notation—which does not appear on any earlier or subsequent e-mails from McFaul to Olsen—means that McFaul understood Olsen to be threatening litigation.

As we read this letter, Rocher initially sought to *enforce* the agreement outlined in his employment offer letter and *continue* his partnership with Nobility. He hoped to work things out, not litigate. While it was conceivable that Rocher might resort to litigation if Nobility refused to do so, there is nothing in the October letter signaling that litigation was anything more than a theoretical possibility at that point. As the court explained in *Anapol*, *supra*, 211 Cal.App.4th 809, "[W]here one party to a contract requests the other party to perform its duties under the agreement," the "possibility of litigation in the event of nonperformance is not enough to conclude the [request] is made in anticipation of litigation contemplated in good faith and under serious consideration." (*Id.* at p. 828.)

In phone calls and e-mails over the next few months, the conversation between Olsen and McFaul evolved into settlement discussions. "Statements made to try to settle potential litigation (i.e., a dispute that has not yet ripened into an actual lawsuit) may, depending on context, be protected by the anti-SLAPP law. However, such statements are not automatically protected just because the context might be called 'settlement negotiations.'" (*Nirschl*, *supra*, 91 Cal.App.5th at p. 401.) As discussed, Rocher's assertions (through Olsen) that he maintained an interest in the LLC were made primarily to urge Nobility to honor that interest, but alternatively to demand a settlement payment of $250,000. The negotiations were geared toward continuing the business relationship or resolving the dispute outside of court. Nowhere in these communications does Olsen suggest or propose Rocher filing suit.

At oral argument, Rocher implored this court to look beyond Olsen's statements, and focus on his own declaration filed in support of his anti-SLAPP motion. He highlights *Osborne v. Pleasonton Automotive Co., LP*

24

(2024) 106 Cal.App.5th 361, where the court observed—in the context of deciding whether the litigation privilege barred the plaintiff's claims at the second step of an anti-SLAPP analysis—that a defendant's declaration can be "particularly probative" of their "state of mind regarding contemplation of litigation." (*Id.* at pp. 382, 384.) In the same breath, it noted that "a court is not bound by such a declaration and must consider other relevant evidence, including circumstantial evidence, bearing on the defendant's state of mind, and such evidence might corroborate or might undermine the defendant's sworn statement." (*Id.* at p. 384.) Here, we have considered Rocher's declaration and it fails to show he was seriously contemplating litigation before Nobility filed its lawsuit.

In his declaration, Rocher averred that he hired Olsen to pursue claims for unlawful termination and breach of contract, among other claims, and that he authorized Olsen to send the October letter "in good faith pursuit of my claims and in anticipation that we would file a lawsuit *if my claims were not resolved.*" (Italics added.) Rocher thus confirms that litigation was only a possibility when he engaged Olsen. (See *Nirschl, supra*, 91 Cal.App.5th at p. 402 [where litigation will occur " 'only if negotiations fail, then future litigation is merely theoretical rather than anticipated and the conduct is therefore not protected prelitigation activity' "].) If Rocher began to seriously contemplate filing suit at some point during the next few months, there is no evidence that belief was ever expressed. (See, e.g., *Anapol, supra*, 211 Cal.App.4th at p. 830 [defendant's "self-serving declaration that, in his own mind, at the time he submitted the claims, his mindset was that the claims would likely be denied and litigation would be necessary . . . is insufficient to establish a prima facie showing' "].)

To the contrary, other evidence strongly suggests that Rocher did not seriously consider initiating litigation until after Nobility filed their lawsuit against him. According to McFaul's declaration, Rocher's litigation counsel "commented to [him] that it was likely that Rocher would have simply gone his separate way had [Nobility] not initiated this action."[9] Moreover, as the trial court noted, Rocher did not file his complaint until May 2023—roughly six months after the first letter to Nobility, and four months after negotiations with Nobility proved unsuccessful. We appreciate that, during some of this time, Rocher was preparing his anti-SLAPP motion in response to Nobility's complaint. Still, the delay is further circumstantial evidence that Rocher was not yet seriously considering litigation between October 2022 and January 2023, when the statements at issue were made.

On this record, we conclude that Rocher has failed to make a prima facie showing that when he claimed his interest in the LLC (through Olsen), the prospect of filing his own lawsuit had ripened into proposed litigation actually contemplated in good faith and under serious consideration. Accordingly, Rocher has not shown that these assertions were protected petitioning activity under the anti-SLAPP statute.[10]

Finally, our decision in *RGC Gaslamp*, *supra*, 56 Cal.App.5th 413, on which Rocher heavily relies, does not compel a different result. In that case, the defendant recorded a mechanic's lien to recoup payment due for sheet metal work done on the plaintiff's hotel project. (*Id*. at pp. 417–418.)

[9]    Rocher asserted on reply that this comment was "false" and "unsupported" but he did not submit a declaration from his attorney who was the other party to this phone call.

[10]    For the same reason, even if we had agreed that Nobility's declaratory relief claim was based on Olsen's statements themselves, we would still conclude that the claim did not arise from protected activity.

26

After the plaintiff secured a bond to release the lien, the defendant filed three additional, duplicative liens, prompting the plaintiff to sue the defendant for slander of title, among other claims. (*Id.* at pp. 417–419.) The trial court granted the defendant's anti-SLAPP motion to strike. (*Id.* at p. 417.) It was undisputed that the plaintiff's action arose out of the filing of the fourth lien. (*Id.* at p. 425.) And the plaintiff acknowledged that recording a mechanic's lien was, in the abstract, protected activity. The plaintiff maintained, however, that the defendant could not have filed *repetitive* liens in good faith while seriously contemplating litigation. (*Id.* at pp. 419, 421, 426.)

We rejected the argument. As we explained, recording a mechanic's lien constitutes protected prelitigation activity because recording the lien is a statutory prerequisite to bringing a foreclosure action. (*RGC Gaslamp*, *supra*, 56 Cal.App.5th at p. 426, citing § 8460.) "It is not a prerequisite for contractual performance or anything else." (*RGC Gaslamp*, at p. 430.) In other words, recording the lien intrinsically anticipates litigation. (See *id.* at pp. 429–430.) We held this was sufficient for the defendant to carry its burden of showing the action arose from protected activity. (*Id.* at p. 430.)

In arguing that the defendant needed to show that it recorded the fourth lien in good faith while seriously considering litigation, the plaintiff was *really* arguing that the defendant needed to prove it had good reason to file a duplicative lien. (See *RGC Gaslamp*, *supra*, 56 Cal.App.5th at p. 426.) We deemed this *additional* showing unnecessary and improper because, as the Supreme Court has made clear, the defendant's burden in the first step of the anti-SLAPP analysis is to establish that its activity is protected by the statute, not that its activity is ultimately lawful, valid, or properly motivated. (*Id.* at pp. 425–427, 429; see also *Navellier v. Sletten* (2002) 29 Cal.4th 82, 94; *Wilson*, *supra*, 7 Cal.5th at pp. 887–888.) "Any claimed illegitimacy of the

27

defendant's acts is an issue that must be raised and supported by the plaintiff in discharging its burden on" step two. (*RGC Gaslamp*, at p. 426.)

We cautioned that "[r]equiring a moving defendant to affirmatively show that its statements were made in good faith while litigation was seriously contemplated" could, at least in some contexts—such as in cases where the prelitigation communication intrinsically anticipates litigation— effectively shift the merits burden from the plaintiff to the defendant. (*RGC Gaslamp*, *supra*, 56 Cal.App.5th at p. 429.) At the same time, however, we recognized that the good-faith-and-serious-consideration test "may be helpful in evaluating prelitigation statements that do not intrinsically anticipate litigation." (*Ibid*.)

In this case, as we have explained, Olsen's communications do not intrinsically anticipate litigation. And Nobility is not contending that these communications would constitute protected activity but for the fact that they were made for some illegitimate reason. *RGC Gaslamp* is therefore distinguishable, and our concerns there are not implicated here.

## DISPOSITION

The order denying the special motion to strike is affirmed. Respondents are entitled to costs on appeal.

DATO, J.

WE CONCUR:

O'ROURKE, Acting P. J.

DO, J.

28